El Juez Asociado Señor Kolthoff Caraballo
emitió la opinión del Tribunal.
Ante el postulado constitucional de que el sistema político puertorriqueño está organizado sobre una base plenamente democrática, y la íntima relación que el mismo tiene con la certeza y estabilidad del proceso electoral, acordamos expedir y disponer en sus méritos el presente recurso de revisión.(1) (Enfasis suplido.)
En los cincuenta y siete años que tiene nuestra Ley Suprema, la Constitución de Puerto Rico, nunca habíamos tenido la oportunidad de interpretar el texto constitucional que este caso nos permite considerar y que forma parte de una de las disposiciones verdaderamente autóctonas de nuestra Constitución.(2) Nos corresponde definir el inciso *38 (b) de la See. 7 del Art. Ill de nuestra Constitución,(3) a los efectos de lo que entraña la expresión “votos depositados”, y a la luz de tal interpretación, determinar la corrección de la fórmula que ha pretendido utilizar la Comisión Estatal de Elecciones (C.E.E.) para establecer la proporcionalidad de los votos obtenidos en las últimas elecciones generales por los dos candidatos que se disputan el último escaño senatorial añadido en virtud de la mencionada disposición constitucional, también conocida como la “Ley de Minorías”.(4)
Debemos determinar si en esa fórmula debe incluirse, para efectos de influenciar la decisión en un evento electoral, la expresión de los electores que depositaron su papeleta en blanco, que la anularon o que votaron por personajes ficticios. Al interpretar esta porción de nuestra Ley Suprema, cumplimos con la función principal de este Tribunal de ser el guardián e intérprete final de nuestra Constitución y de los principios y valores que ésta encarna.(5)
Como requisito insoslayable de lo anterior, nos corresponde entonces evaluar la corrección de lo resuelto por esta Curia en el caso Sánchez y Colón v. E.L.A. I, 134 D.P.R. 445 (1993), referente a incluir —en el total del universo de votos— las papeletas depositadas en blanco, lo que influyó así en el resultado de un evento electoral. Además, nos corresponde revisar la interpretación realizada por la C.E.E. del inciso (2) del Art. 6.012 de la Ley Electoral de Puerto Rico (Ley Electoral),(6) mediante la cual esa agencia *39 eliminó las fracciones del por ciento proporcional de los votos obtenidos por los dos candidatos que se encuentran en disputa por el mencionado escaño. Ante esa interpretación, la C.E.E. declaró un empate y ordenó que se efectuara un sorteo.
Por último, debemos resolver si el tribunal apelativo intermedio actuó correctamente al determinar que procedía la desestimación del recurso de revisión presentado por el peticionario Jorge Suárez Cáceres (Suárez Cáceres) ante el foro primario, por ese tribunal carecer de jurisdicción para atenderlo.(7)
Ciertamente, el caso ante nuestra consideración forma parte de un intrincado proceso que tiene como fin principal determinar a cuál candidato del Partido Popular Democrático (P.P.D.) le corresponde ocupar el último escaño senatorial de acuerdo con el Art. Ill, Sec. 7 de la Constitución de Puerto Rico, supra.
Luego de examinar detenidamente las comparecencias de las partes, así como los autos del Tribunal de Apelaciones y del Tribunal de Primera Instancia, en consideración al alto interés público que ha provocado esta controversia y en defensa de la adecuada representación de las minorías, procedemos a resolver el recurso de epígrafe con la prontitud que amerita. Al así hacerlo, se completa la delegación de la minoría en el Senado de Puerto Rico y, a su vez, se asegura el respeto a los derechos individuales de los senadores, tanto de la minoría como de la mayoría parlamentaria. De esta manera, reconocemos el derecho de la mayoría a tomar las decisiones que le correspondan y, de igual forma, el derecho de la minoría a ser escuchada y a dejar constancia de sus puntos de vista.(8)
*40 Por las razones que exponemos a continuación, este Foro revoca la decisión emitida por el Tribunal de Apelaciones. Veamos, en detalle, los hechos que dieron lugar al presente recurso.
I
El 23 de enero de 2008 la C.E.E. emitió la Resolución CEE-RS-08-04, en la cual interpretó —para efectos de las elecciones generales del 4 de noviembre de 2008— la frase “votos totales depositados para esa posición”, según dispuesta en el Art. 6.011 de la Ley Electoral, 16 L.P.R.A. see. 3271.(9) De forma unánime, la C.E.E. resolvió que la mencionada frase “se refiere al total de votos depositados por los candidatos”, por lo que las papeletas en blanco,(10) las protestadas,(11) las nulas(12) y las de nominación directa de personajes ficticios no se considerarían “votos depositados para esa posición”. De acuerdo con esa interpretación, sólo se contarían “los votos emitidos por los candidatos postulados por los partidos políticos y los votos por nominación *41 directa de personas naturales para determinada posición”.(13)
Luego del evento electoral del 4 de noviembre de 2008, la C.E.E. celebró un escrutinio general de las elecciones, conforme lo establece el Art. 6.008 de la Ley Electoral.(14) A base de los resultados obtenidos por los candidatos a senador por el distrito de Humacao, el 12 de diciembre de 2008 el aspirante José L. Dalmau Santiago (Dalmau Santiago) solicitó a la C.E.E. un recuento de los votos emitidos para el mencionado cargo.(15) Dalmau Santiago indicó que, según el Art. 6.011 de la Ley Electoral, supra, procedía el recuento debido a que la diferencia entre la candidata Mariíta Santiago y él era “la mitad del uno por ciento (0.5%) de los votos totales depositados para esa posición, o menos ...”. 16 L.P.R.A. see. 3271. Específicamente, Mariíta Santiago obtuvo 117,341 votos, mientras que Dalmau Santiago logró 115,612 votos.
La petición de recuento fue presentada al pleno de la C.E.E., pero los comisionados electorales no llegaron a un acuerdo unánime sobre cómo resolverla, por lo que el Hon. Ramón E. Gómez Colón (Presidente de la C.E.E.) tomó la decisión final sobre el asunto: ordenó el recuento de los votos obtenidos por todos los candidatos de la papeleta legislativa para el distrito de Humacao.
*42 Inconforme con la determinación emitida por el Presidente de la C.E.E., el 16 de diciembre de 2008 el Ledo. Gerardo A. Cruz Maldonado (Ledo. Cruz Maldonado) presentó ante el foro primario un escrito de revisión (caso Civil Núm. KPE2008-4333) en calidad de Comisionado Electoral del P.P.D.(16) En síntesis, expuso que el Presidente de la C.E.E. erró al ordenar un recuento para todos los cargos de la papeleta legislativa del distrito de Humacao, pues ello incluía el recuento de votos sobre unos cargos electivos en los cuales no había controversia.(17) El Ledo. Cruz Maldonado solicitó la paralización inmediata del recuento ordenado por el Presidente de la C.E.E. hasta tanto el foro primario resolviera el recurso.
El foro primario señaló una vista argumentativa y un juicio de novo para el 17 de diciembre de 2008. En esa misma fecha, el recurrido Angel Rodríguez Otero (Rodríguez Otero) —quien era candidato a Senador por el distrito de Guayama— presentó una solicitud de intervención en el caso, en la que alegó que el recuento ordenado por el Presidente de la C.E.E. afectaría su interés de ocupar el último escaño senatorial por el P.P.D. en virtud del Art. Ill, Sec. 7 de la Constitución de Puerto Rico, supra, y del Art. 6.012 de la Ley Electoral, supra. Planteó que luego del escrutinio general, él obtuvo una proporción del 22.73% de los votos en su distrito (Guayama), mientras que Jorge Suárez Cáceres (Suárez Cáceres) —el más cercano contendiente en cuanto a proporcionalidad de votos en todos los distritos senatoriales de Puerto Rico— obtuvo un 22.72% de los votos en su distrito (Humacao).
*43 En su petición de intervención, Rodríguez Otero enfatizó que debido a que el recuento ordenado por el Presidente de la C.E.E. era sobre toda la papeleta legislativa para el distrito de Humacao, ello conllevaba la revisión de los votos obtenidos por Suárez Cáceres. Según Rodríguez Otero, esa revisión de los votos de Suárez Cáceres podía representar un cambio en el total de los votos que éste recibió, lo que a su vez podía incidir sobre la proporcionalidad de los votos obtenidos por ambos candidatos luego del escrutinio general (22.73% de Rodríguez Otero y 22.72% de Suárez Cáceres).
Finalmente, en su solicitud de intervención, Rodríguez Otero expuso que el procedimiento de recuento no podía extenderse —por decisión administrativa— a otros puestos o candidatos que no tenían derecho a éste debido a que no existía la diferencia de votos que contempla el Art. 6.011 de la Ley Electoral, supra. Al igual que el Ledo. Cruz Maídonado, Rodríguez Otero solicitó la paralización inmediata del recuento.
El foro primario declaró “con lugar” la petición de intervención de Rodríguez Otero y pautó la vista argumentativa para el día siguiente, esto es, el 18 de diciembre de 2008. Llegado ese día, todas las partes comparecieron y Suárez Cáceres presentó una solicitud de intervención en el caso. Este adujo que tenía interés en la controversia, pues el recuento ordenado por el Presidente de la C.E.E. podía culminar con un resultado positivo para su candidatura. En particular, expresó que si luego del recuento Dalmau Santiago prevalecía sobre Mariíta Santiago, entonces aquél entraba como Senador electo y no por la “Ley de Minorías”. Suárez Cáceres indicó que si la proporción de sus votos aumentaba luego del recuento, podía desplazar a Rodríguez Otero, quien no estaba sujeto a recuento debido a que pertenecía al distrito de Guayama.
Con la oposición de Rodríguez Otero, el foro primario permitió la intervención de Suárez Cáceres y, a su vez, re *44 consideró motu proprio su decisión de permitir la intervención de Rodríguez Otero en el caso KPE2008-4333. El foro primario cuestionó qué interés podía tener Rodríguez Otero —como candidato a senador por el distrito de Guayama— sobre el recuento de los votos de la papeleta legislativa del distrito de Humacao. Por todo lo cual, el foro primario reconsideró y denegó la petición de intervención presentada por Rodríguez Otero, pero luego le ofreció participar como amicus curiae. Este ofrecimiento Rodríguez Otero no lo aceptó.
Ante la denegatoria del foro primario a su petición de intervención, el 19 de diciembre de 2008 Rodríguez Otero recurrió al Tribunal de Apelaciones mediante una solicitud en auxilio de jurisdicción y un recurso de certiorari (KLCE200801801); ese tribunal apelativo ordenó la paralización de los procedimientos ante el foro primario. El 23 de diciembre de 2008, el tribunal apelativo intermedio emitió una sentencia mediante la cual modificó el dictamen del foro primario, para permitir la intervención de Rodríguez Otero en el caso KPE2008-4333. Además, dejó sin efecto la orden de paralización que había emitido y autorizó la continuación de los procedimientos ante el foro primario.(18) En esa ocasión, el Tribunal de Apelaciones expresó lo siguiente:
... el señor Rodríguez tiene interés evidente en cuanto al alcance del recuento de votos del Distrito Senatorial de Humacao. Su interés obedece a que aunque no resultó electo por el Distrito Senatorial de Guayama, ha entrado hasta el presente como Senador añadido por virtud de la Ley de Minorías al obtener el 22.73% de los votos de su Distrito. El señor Jorge Suárez fue su más cercano competidor con el 22.72% de los votos de su Distrito. Por consiguiente, el recuento según ordenado del Distrito Senatorial de Humacao, al incluir al señor Jorge Suárez, podría afectar su total de votos y aumentar su proporción de votos obtenidos. Esto indudablemente afectaría el interés del señor Rodríguez de mantenerse como Sena *45 dor por adición en virtud de la Ley de Minorías. Ello por sí, le da legitimación para tener derecho de ser oído ante el TPI respecto a la procedencia o improcedencia del recuento de la forma en que fue ordenado por la Comisión Estatal de Elecciones. En vista de todo ello, tanto el señor Jorge Suárez como el señor Rodríguez tienen un interés, aunque antagónico, en el pleito que amerita protección.(19) (Énfasis suplido.)
Luego de la determinación del Tribunal de Apelaciones en el recurso KLCE200801801 y con el fin de salvaguardar los derechos del interventor en el caso, el foro primario ordenó que a Rodríguez Otero se le entregara copia de toda la prueba documental marcada hasta ese momento y copia de las grabaciones de las vistas del caso (de 17, 18, 19, 22 y 23 de diciembre de 2008), de forma tal que tuviera acceso al testimonio del único perito que había declarado en el pleito, el señor Benicio Carmona Márquez (perito de la C.E.E.).(20)
Reanudado el pleito, el Comisionado Electoral del RRD. sostuvo que sólo debían contarse los votos correspondientes a los cargos de senador por el distrito de Humacao (de todos los partidos que participaron para ese cargo), o sea, contar las líneas dos (2) y tres (3) de la papeleta legislativa. Mientras, Rodríguez Otero expuso que sólo procedía el recuento de los votos emitidos para los candidatos en controversia: Mariíta Santiago y Dalmau Santiago. La C.E.E. reiteró que procedía el recuento de toda la papeleta legislativa del distrito de Humacao, que incluía los cargos siguientes: un representante de distrito, dos Senadores de distrito, un representante por acumulación y un Senador por acumulación.
*46 Mediante una sentencia dictada el 30 de diciembre de 2008, el foro primario resolvió el pleito presentado por el Comisionado Electoral del P.P.D. contra la C.E.E. (caso KPE2008-4333). Específicamente, ese tribunal revocó la decisión del Presidente de la C.E.E. de ordenar el recuento de los votos obtenidos por todos los candidatos de la papeleta legislativa para el distrito de Humacao. Por el contrario, el foro primario determinó que sólo procedía el recuento de los votos emitidos para los dos cargos de senador por el distrito de Humacao, entiéndase, las líneas dos (2) y tres (3) de la papeleta legislativa del mencionado distrito.(21) El foro primario indicó que su dictamen no tendría vigencia inmediata, ello con el fin de salvaguardar el derecho apelativo de las partes, por lo que la C.E.E. no podía proceder con el recuento hasta tanto la decisión del foro primario adviniera final, firme e inapelable. La decisión del foro primario fue archivada en autos y notificada el 30 de diciembre de 2008.
Por otro lado, ese mismo 30 de diciembre de 2008, el Presidente de la C.E.E. emitió la Resolución CEE-RS-08-125, en la que nuevamente se interpretó la frase “votos totales depositados para esa posición” incluida en el Art. 6.011 de la Ley Electoral, supra. Sin embargo, en esa ocasión —contrario a lo ocurrido con la resolución CEE-RS-08-04— no hubo unanimidad entre los comisionados electorales, por lo que el Presidente de la C.E.E. dispuso de la controversia: resolvió que “los votos totales depositados para esa posición” sí incluían las papeletas en blanco, las nulas y las de nominación directa de personas *47 naturales.(22) El Presidente de la C.E.E. añadió que esa interpretación constituía la norma adoptada por la agencia y que fue la utilizada en el proceso de escrutinio de las elecciones del 2008, ya que nunca se puso en vigor la Resolución CEE-RS-08-04.
El Presidente de la C.E.E: dejó sin efecto la Resolución CEE-RS-08-04, de forma retroactiva a la fecha de su promulgación el 23 de enero de 2008, y ordenó la continuación del recuento. De acuerdo con la certificación incluida en esa resolución, Walter Vélez Martínez (Secretario de la C.E.E.) notificó la decisión el 30 de diciembre de 2008 a todas las partes interesadas y, además, informó sobre el derecho a acudir en revisión judicial dentro de los diez siguientes a la notificación de la mencionada resolución.(23)
Por otra parte, Dalmau Santiago retiró su petición de recuento, y el 2 de enero de 2009, la C.E.E. —con el voto afirmativo de los dos comisionados electorales—(24) certificó la elección de Mariíta Santiago como Senadora del distrito de Humacao, por el P.N.P., y de Dalmau Santiago y Eder Ortiz Ortiz como senadores del P.P.D. añadidos en virtud del Art. Ill, Sec. 7 de la Constitución de Puerto Rico, supra. Los comisionados electorales no llegaron a un acuerdo respecto a quién sería el último senador del P.P.D. que debía ser certificado en virtud de la “Ley de Minorías”, por lo que correspondía que el Presidente de la C.E.E. resolviera el asunto.(25) De acuerdo con éste, como Rodríguez Otero obtuvo un resultado proporcional de 22.7336% y *48 Suárez Cáceres obtuvo un 22.7246%, entonces procedía que —conforme al Art. 6.012 de la Ley Electoral, supra— se descartaran las fracciones menores de la mitad de uno. Mediante la Resolución CEE-RS-09-01 del 8 de enero de 2009, el Presidente de la C.E.E. declaró que había un em-pate entre ambos candidatos debido a que el resultado proporcional fue de 22.7% para cada uno, por lo que ordenó la celebración de un sorteo según dispone el Art. 6.012 de la Ley Electoral, supra.(26)
Insatisfecho con la decisión emitida el 30 de diciembre de 2008 por el foro primario en el caso KPE2008-4333, Rodríguez Otero presentó un recurso ante el Tribunal de Apelaciones el 9 de enero de 2009 (KLCE200900044). En resumen, adujo que el foro primario erró al ordenar un recuento que incluía a todos los candidatos al cargo de senador por el distrito de Humacao. Luego, el 13 de enero de 2009, Rodríguez Otero presentó una moción en auxilio de jurisdicción, en la cual solicitó la paralización del sorteo o cualquier otro procedimiento ante la C.E.E. Además, planteó que la C.E.E. interpretó de forma errónea el Art. 6.012 de la Ley Electoral, supra, al pretender eliminar las fracciones (del por ciento proporcional de votos) obtenidas por Suárez Cáceres y Rodríguez Otero, ello con el fin de crear un “empate artificial” y acudir a un sorteo.(27)
El mismo 13 de enero de 2009, el Tribunal de Apelaciones expidió el auto de certiorari solicitado por Rodríguez Otero en el recurso KLCE200900044. Además, ordenó la paralización del sorteo decretado por el Presidente de la C.E.E., suspendió la ejecución de la sentencia emitida por el foro primario el 30 de diciembre de 2008 y solicitó la comparecencia de las partes recurridas.(28) En sus respectivas comparecencias, tanto la C.E.E. como el interventor *49 Suárez Cáceres expresaron que la controversia ante ese foro apelativo se tornó académica, ya que Dalmau Santiago había retirado su petición de recuento. El 15 de enero de 2009, el tribunal apelativo intermedio emitió una resolución en la que concluyó que la determinación de la C.E.E. (de ordenar el sorteo) carecía de eficacia jurídica debido a que fue dictada en contravención a lo dispuesto por el foro primario en la sentencia del 30 de diciembre de 2008. Finalmente, el 3 de febrero de 2009, el Tribunal de Apelaciones emitió una sentencia mediante la cual desestimó, por academicidad, el recurso presentado por Rodríguez Otero (KLCE200900044).

En el ínterin de la adjudicación del recurso KLCE200900044 por el foro apelativo intermedio, el 20 de enero de 2009 Suárez Cáceres presentó un escrito de revisión ante el foro de instancia (caso Civil Núm. KPE20090145). Específicamente, recurrió de la Resolución CEE-RS-08-125 emitida el 30 de diciembre de 2008 por el Presidente de la C.E.E. en torno a la interpretación de la frase “votos depositados para esa posición”. Suárez Cáceres expuso que los cómputos utilizados por la C.E.E. para concluir que existía un empate entre Rodríguez Otero (22.7336% de los votos) y él (22.7246% de los votos) partían de una “ecuación matemática incorrecta”, pues se consideraron las papeletas en blanco, las protestadas, las nulas y las de nominación directa de personajes ficticios.

Según Suárez Cáceres, la decisión de la C.E.E. de contar esas papeletas era contraria a la resolución emitida por la C.E.E. el 23 de enero de 2008 (CEE-RS-08-04), la cual constituía el estado de derecho vigente al momento de las elecciones generales. Por todo lo cual, éste solicitó que el foro primario ordenara: (1) la paralización de los efectos de la resolución CEE-RS-08-125; (2) que la C.E.E. no certificara candidato alguno hasta tanto se resolviera la controversia, y (3) que la C.E.E. certificara los resultados de Suárez Cáceres y Rodríguez Otero sin tomar en cuenta las *50 papeletas en blanco, las protestadas, las nulas y las de nominación directa de personajes ficticios.
El 21 de enero de 2009, el foro primario dictó una orden para que la C.E.E. y las demás partes en el litigo mostraran causa por la cual ese tribunal no debía acceder al recurso de revisión presentado por Suárez Cáceres y anular la Resolución CEE-RS-08-125 emitida por el Presidente de la C.E.E. El foro primario señaló una vista argumentativa y un juicio de novo para el 23 de enero de 2009.
Entretanto, el mismo 21 de enero de 2009, el Ledo. Gautier Vega (Comisionado Electoral del P.P.D.) presentó ante la C.E.E. un escrito titulado Moción Solicitando Remedio. En éste, el Ledo. Gautier Vega expresó que la interpretación del Art. 6.012 de la Ley Electoral, supra, por parte del Presidente de la C.E.E. y del señor Edwin Mundo Ríos (Comisionado Electoral del P.N.P.) constituía una interpretación errada, inconstitucional y contradictoria para decretar un empate “artificial” para el último escaño senatorial del P.P.D., añadido en virtud de la ley de minorías, y entonces “ordenar un sorteo ilegal”.(29) El Comisionado Electoral del P.P.D. solicitó que se certificara a Rodríguez Otero como el último senador por el P.P.D., añadido en virtud de la “Ley de Minorías”.
Rodríguez Otero presentó ante el foro primario un memorando de derecho, con fecha de 28 de enero de 2009, en el caso KPE200900145. Argumentó que Suárez Cáceres presentó su recurso fuera del término de diez días estable *51 cido para recurrir en revisión judicial de las decisiones de la C.E.E., por lo que ese tribunal carecía de jurisdicción para considerar la controversia.(30) Según Rodríguez Otero, el Secretario de la C.E.E. notificó la Resolución CEE-RS-08-125 el 30 de diciembre de 2008, por lo que el término de diez días vencía el 9 de enero de 2009; no obstante, Suárez Cáceres presentó su caso el 20 de enero de 2009. Rodríguez Otero añadió que debido a que la Resolución CEE-RS-08-125 era sobre recuentos, la C.E.E. no tenía la obligación de notificarle la decisión a Suárez Cáceres, ya que éste no era parte afectada y, por lo tanto, no tenía legitimación activa para instar un recurso de revisión ante el foro primario. Ese memorando de derecho fue acogido por el foro primario como una moción de desestimación.
A petición del foro primario, el 30 de enero de 2009 el Secretario de la C.E.E. emitió una certificación oficial en la que expuso que las partes interesadas en la Resolución CEE-RS-08-125 eran los comisionados electorales, el Presidente de la C.E.E., Rodríguez Otero y Suárez Cáceres. Además, indicó que a Rodríguez Otero se le notificó tal resolución el 9 de enero de 2009 a través de un mensajero y a Suárez Cáceres el 7 de enero de 2009 vía fax.(31)
El 5 de febrero de 2009 Rodríguez Otero presentó ante el foro primario una moción de desestimación por falta de legitimación activa y academicidad, en la cual reiteró los planteamientos expuestos en su memorando de derecho. El foro primario celebró una vista con el propósito de aclarar el planteamiento de prescripción planteado en el caso de Suárez Cáceres (caso Civil Núm. KPE2009-0145). En particular, el foro primario deseaba aclarar la incongruencia entre la alegada fecha de notificación de la resolución CEE-RS-08-125 (30 de diciembre de 2008) y la fecha de *52 notificación a Suárez Cáceres (7 de enero de 2009), según surgía de una certificación expedida por el Secretario de la C.E.E. el 30 de enero de 2009.
Luego de examinar la prueba documental y escuchar el testimonio del Secretario de la C.E.E., el foro primario dictó una resolución el 5 de febrero de 2009, mediante la que declaró “no ha lugar” las dos mociones presentadas por Rodríguez Otero.(32) Resolvió que no había duda de que la notificación a Suárez Cáceres se efectuó el 7 de enero de 2009 vía fax, según éste había alegado en su demanda y conforme fue certificado por el Secretario de la C.E.E., por lo que la causa de acción no estaba prescrita.(33) En cuanto al planteamiento sobre legitimación activa expuesto por Rodríguez Otero, el foro de instancia expuso que tanto Suárez Cáceres como Rodríguez Otero serían “parte afectada”, dependiendo de cómo se computara la proporcionalidad de los votos. Por todo lo cual, el foro primario determinó que ambos eran “partes interesadas” en el proceso de revisión de la resolución del Presidente de la C.E.E. (CEE-RS-08-125).
Luego de evaluar los planteamientos de las partes, la totalidad del expediente y el testimonio del perito de la C.E.E (único perito en el caso), el 6 de febrero de 2009 el foro de instancia dictó sentencia en el caso presentado por Suárez Cáceres (caso Civil Núm. KPE2009-0145). Ese tribunal concluyó que la resolución unánime emitida por la C.E.E. el 23 de enero de 2008 (CEE-RS-08-04) era jurídicamente correcta, estaba vigente el día de las elecciones *53 generales del 2008 y ambos candidatos descansaron en ésta como el estado de derecho que regía en aquel momento. En consecuencia, ese foro revocó la resolución impugnada por Suárez Cáceres (CEE-RS-08-125) y con ello quedó vigente la Resolución CEE-RS-08-04 dictada el 23 de enero de 2008. No obstante, el foro primario instruyó a la C.E.E. a que no certificara a candidato alguno hasta tanto la determinación adviniera final, firme e inapelable, ello con el propósito de salvaguardar el derecho apelativo de las partes. La determinación del foro primario fue archivada en autos y notificada el 9 de febrero de 2009.
Así las cosas, el 13 de febrero de 2009, Rodríguez Otero presentó un recurso (KLCE200900185) ante el Tribunal de Apelaciones, en el cual solicitó que se revocara la decisión emitida por el foro de instancia el 6 de febrero de 2009 en el caso KPE2009-0145.(34) Además, solicitó que se ordenara a la C.E.E. que procediera a certificarlo como el candidato *54 que ocuparía el último escaño senatorial por el P.P.D. y que el Senado lo juramentara al cargo. El 18 de febrero de 2009, el Tribunal de Apelaciones emitió una resolución en la que concedió un término de diez días para que las partes recurridas se expresaran en torno al recurso presentado por Rodríguez Otero (KLCE200900185).(35)
La C.E.E. compareció ante el tribunal apelativo intermedio y aclaró que la controversia del caso no giraba en torno a un derecho a recuento, sino a cómo adjudicar la proporcionalidad de los votos obtenidos por ambos candidatos para determinar a cuál aspirante le correspondía el último escaño senatorial por el P.P.D. La agencia indicó que la “realidad operacional” fue a los efectos de que, contrario a lo establecido por la Resolución CEE-RS-08-04, durante el escrutinio general sí se contaron las papeletas en blanco, las protestadas, las nulas y las de nominación directa de personajes ficticios; ello para determinar la proporcionalidad de los votos obtenidos por los candidatos. Además, la C.E.E. añadió que “bajo cualquier esquema que los tribunales avalen, los candidatos siguen en un virtual empate, por lo que procede un sorteo según lo conmina el Art. 6.012 antes citado”.(36)
*55 Suárez Cáceres también compareció ante el Tribunal de Apelaciones para fijar su posición en cuanto al recurso KLCE200900185. Reiteró que conforme a la fórmula incluida en la resolución CEE-RS-08-125, Rodríguez Otero prevalecería por menos de la mitad del uno por ciento, mientras que bajo el esquema de la Resolución CEE-RS-08-04, él sería el ganador. Rebatió ampliamente los seis errores señalados por Rodríguez Otero y solicitó que se denegara el recurso presentado por Rodríguez Otero.
El Tribunal de Apelaciones, mediante una sentencia dictada el 2 de marzo de 2009 y notificada el 5 de marzo de 2009, expidió el auto de certiorari, revocó la determinación del foro de instancia en el caso KPE200900145 y desestimó el recurso de revisión presentado ante el foro primario por Suárez Cáceres. Concluyó que el foro de instancia actuó de forma ilegítima al atender el recurso presentado por Suárez Cáceres, ya que debió desestimarlo por falta de jurisdicción puesto que fue presentado tardíamente.(37) Añadió el Tribunal de Apelaciones que el Secretario de la C.E.E. actuó de manera ultra vires al notificar la resolución a Suárez Cáceres y a Rodríguez Otero, ya que no estaba facultado para determinar que éstos eran partes interesadas a los efectos de notificarles la resolución y concederles el derecho a solicitar la revisión judicial.(38)
El 10 de marzo de 2009, Suárez Cáceres presentó una moción de reconsideración ante el tribunal apelativo intermedio. Argumentó que la decisión de ese foro en el caso KLCE200900185 “parte de una premisa equivocada” al concluir que el Secretario de la C.E.E. fue quien determinó que Suárez Cáceres y Rodríguez Otero eran partes *56 interesadas a los efectos de notificarles la Resolución CEE-RS-08-125. Suárez Cáceres refutó esa premisa al exponer que la prueba desfilada ante el foro primario dejó establecido que la persona que determinó quiénes eran las partes interesadas fue el Presidente de la C.E.E. En cuanto a las resoluciones de la C.E.E., Suárez Cáceres señaló que el Tribunal de Apelaciones tuvo la oportunidad de evaluar que la notificación en fechas distintas no sólo se dio en el caso de la Resolución CEE-RS-08-125, sino que también ocurrió con la Resolución CEE-RS-08-04,(39) por lo que no se le podía privar de su derecho a solicitar la revisión judicial debido a “errores clericales de tribunales u organismos gubernamentales o por desfases en la notificación”. (Enfasis suprimido.)(40)
Mediante Resolución de 11 de marzo de 2009, el Tribunal de Apelaciones concedió hasta el 17 de marzo de 2009 para que Rodríguez Otero se expresara en tomo a la solicitud de reconsideración. En esa fecha, Rodríguez Otero presentó una moción para oponerse a la reconsideración. Finalmente, el 24 de marzo de 2009, ese foro apelativo emitió una resolución en la que declaró “no ha lugar” la petición de reconsideración. Reiteró que la acción del Secretario de la C.E.E. de “determinar” que Suárez Cáceres y Rodríguez Otero eran partes interesadas, a los efectos de notificarles la Resolución CEE-RS-08-125, constituyó “una actuación ultra vires [y,] por lo tanto, viciada de nulidad radical”.(41) Esa resolución fue archivada en autos y notificada el 25 de marzo de 2009.
Inconforme con la sentencia del Tribunal de Apelaciones, Suárez Cáceres presentó ante este Foro un recurso de *57 certiorari el 3 de abril de 2009. Señaló que el tribunal apelativo intermedio cometió los dos errores siguientes:
A. Erró el Tribunal de Apelaciones al revocar la Sentencia dictada por el Tribunal de Primera Instancia al interpretar que quien determinó qui[é]nes eran las partes interesadas en relación a la notificación de la Resolución CEE-RS-08-125 fue el secretario de la C.E.E. Walter Vélez, cuando en realidad fue la C.E.E. por mandato de su Presidente, Hon. Ramón Gómez Colón.
B. Erró el Tribunal de Apelaciones al desestimar el caso por falta de jurisdicción y al sustituir el criterio del TPI sin cerciorarse del testimonio del Secretario Walter Vélez. (Énfasis suprimido.) Escrito de certiorari, pág. 12.
En su recurso, el peticionario Suárez Cáceres también nos planteó que la controversia del caso giraba en tomo a un asunto novel, entiéndase: la forma en que se computarán los por cientos para determinar a quién le corresponde el último escaño senatorial por el P.P.D. en virtud de la “Ley de Minorías”, esto es, si se contarán las papeletas en blanco, las protestadas, las nulas y las de nominación directa de personajes ficticios o si, por el contrario, se descartarán por no ser papeletas válidamente adjudicadas. Suárez Cáceres argumentó que tomar en cuenta las papeletas “no adjudicadas” (en blanco, las nulas, las protestadas y las de nominación directa de personajes ficticios) es totalmente contrario a la Ley Electoral, ello para los efectos de la proporcionalidad al dilucidar qué candidato ocupará un escaño al amparo de la “Ley de Minorías”.
El 13 de abril de 2009, Rodríguez Otero presentó un memorando en oposición a la expedición del auto de certiorari. Entre otros asuntos, expresó que en el caso Sánchez y Colón v. E.L.A. I, supra, ya este Tribunal resolvió la controversia sobre cómo se computan las papeletas en blanco, las protestadas, las nulas y las de nominación directa de personajes ficticios.(42) Además, Rodríguez Otero *58 nos solicitó que no expidiéramos el recurso presentado por Suárez Cáceres y que ordenáramos a la C.E.E. que lo certificara como el candidato que ocuparía el último escaño senatorial por el P.P.D. añadido en virtud de la “Ley de Minorías”.
Luego de examinar la Petición de certiorari y el memorando en oposición, el 29 de abril de 2009 emitimos una resolución mediante la cual expedimos el auto de certiorari solicitado y ordenamos que el Tribunal de Apelaciones nos remitiera los autos originales o una copia certificada del caso Jorge Suárez Cáceres v. Comisión Estatal de Elecciones y otros, Caso Núm. KLCE200900185.(43)
A pesar de que la Regla 21(C) del Reglamento del Tribunal Supremo de Puerto Rico(44) dispone que el escrito de oposición a la expedición del auto de certiorari se considerará a todos los efectos como el alegato de la parte recurrida (a no ser que otra cosa provea este Foro), Rodríguez Otero presentó un alegato el 6 de mayo de 2009 en el que reiteró lo expuesto en su memorando en oposición. Manifestó que, conforme al Art. Ill, Sec. 7 de la Constitución de Puerto Rico, supra, y los resultados del escrutinio general, a él le corresponde el último escaño senatorial del P.P.D. en virtud de la “Ley de Minorías” puesto que obtuvo .01% de ventaja sobre su más cercano contendiente, Suárez C áceres.(45)
*59 En cuanto al Art. 6.012 de la Ley Electoral, supra, Rodríguez Otero expresó lo siguiente:
... al atender la letra clara del Artículo 6.012 de la Ley Electoral, supra, es mandatorio concluir que la CEE ha errado en su interpretación. De una simple lectura al mismo, vemos c[ó]mo no aplica a la situac[ió]n de autos [,] ya que tanto [Rodríguez Otero] como [Suárez Cáceres], ambos tienen los siguientes resultados: 22.73% para el primero, y 22.72% para el segundo. Ese artículo sólo “permite” la eliminación de fracciones de menos de .50% de candidatos en la proporción de votos en relación con la proporción de los votos depositados a favor de otros candidatos no electos. Es decir, ambos candidatos cuentan con po[r c]ientos superiores a ese .50% y la CEE no puede eliminar sus fracciones respectivas de .73% y .72% para hacer un empate artificial bajo dicho articulado. Así, que pretender aplicar esta nueva fórmula matemática discriminatoria en este caso particular, cuando no se aplicó a ningún otro caso de Ley de Minorías, atenta contra el principio cardinal de la voluntad del elector denominado; “Un hombre, un voto”y “la igual protección de las leyes” ....
Es menester clarificar que ese artículo, NO otorga margen para interpretar que el .50%, como parámetro para eliminar fracciones menores de po[r c]ientos de candidatos, pudiera aplicarse a diferencias entre po[r c\ientos como se pretende por la CEE. Parece, que es necesario distinguir al organismo que tiene el “expertise” para dilucidar controversias electorales en Puerto Rico que una cosa es el .50% de diferencia para determinar un recuento entre candidatos y otra, la supuesta facultad de la CEE PARA ELIMINAR FRACCIONES MENORES DE .50% PARA reglamentar LA DISPOSICIÓN CONSTITU-CIONAL DE LA LEY DE MINORÍAS. (Énfasis suplido y en el original.)(46)
Rodríguez Otero añadió que permitir la eliminación de “por cientos de candidatos” es legitimar la eliminación de unos votos válidamente emitidos y contados, todo ello para igualar unos candidatos que no están en un empate y de esa forma “embarcarlos en un sorteo antidemocrático”.(47)
*60 II
A. La doctrina de justiciabilidad y nuestra jurisdicción para atender el recurso
 El concepto de justiciabilidad tiene su origen en la jurisdicción norteamericana, específicamente derivado del Art. Ill, Sec. 2 de la Constitución de Estados Unidos.(48) Este concepto requiere la existencia de un caso o controversia real para ejercer válidamente el poder judicial.(49) Aunque en la Constitución de Puerto Rico no se incluyeron los términos “caso o controversia”, al poco tiempo de la aprobación de ésta ambos términos fueron integrados a nuestro ordenamiento jurídico a través de la jurisprudencia. En particular, en E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958), resolvimos que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen un interés real en obtener un remedio que haya de afectar sus relaciones jurídicas.
En reiteradas ocasiones, hemos expresado que la controversia planteada ante los tribunales debe ser definida, concreta, que afecte las relaciones jurídicas de partes que tienen un interés jurídico antagónico; la controversia debe ser real y sustancial, y que permita un remedio específico mediante una sentencia de carácter concluyente.(50)
De acuerdo con la doctrina de justiciabilidad, los tribunales se cuestionan y evalúan si es apropiado o no atender determinado caso, tomando en consideración diversos factores y circunstancias mediante un análisis que les permita ejercer su discreción en cuanto al límite de su *61 poder constitucional. Esos elementos son corolarios de la norma de justiciabilidad.(51)
A través de nuestra jurisprudencia, hemos señalado que un asunto no es justiciable en diversas instancias (1) cuando se trata de resolver una cuestión política; (2) cuando una de las partes no tiene capacidad jurídica (legitimación activa o standing) para promover un pleito; (3) cuando después de comenzado un pleito, unos hechos posteriores lo convierten en académico; (4) cuando las partes buscan obtener una opinión consultiva, o (5) cuando se promueve un pleito que no está maduro.(52)
En el voto disidente emitido por el Juez Presidente Señor Hernández Denton, en ocasión de la expedición del recurso de autos el 29 de abril de 2009, se planteó —en síntesis— que el certiorari del peticionario Suárez Cáceres era “evidentemente académico” y que Suárez Cáceres no poseía legitimación activa “para continuar instando los procedimientos relacionados a esta controversia” debido a que éste no tenía derecho a participar en un recuento.
Además, en ese voto disidente se señaló que el recurso “es fútil” porque la C.E.E. reiteradamente ha asumido la postura de que bajo cualquier esquema que los tribunales avalen, ambos candidatos siguen en un virtual empate, por lo que procede un sorteo. También se indicó que esa postura no había sido cuestionada hasta ese momento. La posición asumida en el mencionado voto disidente se limita a centrar este recurso simplemente como una controversia sobre recuento, cuando la realidad es categóricamente otra. Lo cierto es que la controversia en este caso entraña una disputa con relación al Art. Ill, Sec. 7 de la Constitución de Puerto Rico, supra, en cuanto a cómo debe adjudicarse la proporcionalidad de los votos obtenidos por Suárez Cáceres y Rodríguez Otero en sus respectivos distritos se *62 natoriales, ello para decidir finalmente a cuál de los dos candidatos le corresponde el último escaño senatorial por el P.P.D. añadido en virtud de la “Ley de Minorías”. Para eso, es menester decidir qué papeletas se contarán para efectos de los “votos totales depositados para esa posición” y de esa manera conocer cuál de los dos candidatos obtuvo la mayor proporción de los votos. En vista de lo anterior, es evidente que el peticionario Suárez Cáceres sí tiene standing.
De hecho, la propia C.E.E., en su “Moción para fijar posición de la Comisión Estatal de Elecciones”, que presentara ante el Tribunal de Apelaciones, señala que esta “controversia no es sobre un derecho a recuento, sino, más bien, de cómo se va a adjudicar la ‘proporcionalidad’ de los votos obtenidos para decidir a cuál candidato le corresponde el último escaño en el Senado de la minoría del PPD”. (Enfasis en el original.)(53)
En cuanto a lo expresado en el mencionado Voto disidente con relación a que, al momento que expedimos este recurso, la postura de la C.E.E. —en torno a que existía un empate y, por lo tanto, procedía celebrar un sorteo— no había sido cuestionada, no es correcto. Lo cierto es que desde el 13 de enero de 2009 el Tribunal de Apelaciones conocía que el aquí recurrido Rodríguez Otero había cuestionado la interpretación utilizada por la C.E.E. del Art. 6.012 de la Ley Electoral, supra, en cuanto a la forma de trabajar con las fracciones de los por cientos de los candidatos, e incluso había solicitado la paralización del referido sorteo.(54) Tales planteamientos fueron presentados nuevamente por Rodríguez Otero ante esta Curia y éste llegó a expresar que el alegado empate declarado por la C.E.E. era artificial y que el sorteo era antidemocrático.(55)
En conclusión, es evidente que el caso ante nuestra con *63 sideración sí es justiciable. Conforme a nuestra responsabilidad como último foro apelativo en el País, no podíamos obviar una controversia que no sólo es justiciable, sino que constituye un asunto que afecta la representación de la delegación minoritaria en el Senado de Puerto Rico.
Por tal razón, expedimos el auto de certiorari solicitado y requerimos —con la brevedad que ameritaba el asunto— los autos del caso, tanto del Tribunal de Apelaciones como del Tribunal de Primera Instancia. Y es que, como parte del descargo responsable de nuestra función revisora, entendimos que era totalmente necesario evaluar ambos ex-pedientes (el del foro apelativo intermedio y el del foro primario), de forma tal que tuviéramos un cuadro completo de los hechos acontecidos. Nuestra conciencia no nos permitía otra cosa.
Ciertamente, el avión “caza huracanes” salió a enfrentar lo que el radar meteorológico mostraba como una tormenta. Sin embargo, al acercarse al fenómeno, encontró algo más cerca de su centro: tremendos vientos sostenidos con fuerza de huracán que, sin duda alguna, amenazaban la representación de la delegación minoritaria en el Senado de Puerto Rico y los derechos de miles de puertorriqueños a quienes éstos representan. Estos ciudadanos no pasaron el trabajo de acudir a las urnas para que fuera “la suerte” la que finalmente completara la delegación de sus senadores en la Cámara Alta. Ahora, nuestro avión “caza huracanes” puede regresar confiadamente a casa, en donde, con sosiego, meditaremos en los deberes que nos impone día a día la defensa de nuestro esquema constitucional y democrático.
B. La jurisdicción del Tribunal de Primera Instancia
El Tribunal de Apelaciones desestimó, por falta de jurisdicción, la causa de acción que Suárez Cáceres había presentado ante el foro primario, pues interpretó que éste presentó la revisión del dictamen de la C.E.E. fuera del *64 término establecido por ley. En esta etapa, por estar estrechamente relacionados, discutiremos conjuntamente los dos errores planteados por Suárez Cáceres en el recurso ante nuestra consideración.
El Art. 1.016 de la Ley Electoral, 16 L.P.R.A. see. 3016a, concede un término de diez días a “\c]ualquierparte afectada por una resolución” (énfasis suplido) de la C.E.E. para acudir en revisión judicial ante el Tribunal de Primera Instancia. De inicio, debemos señalar que este Foro no alberga duda alguna de que las partes notificadas el 7 y 9 de enero de 2009, o sea, Suárez Cáceres y Rodríguez Otero, respectivamente, son “partes afectadas” en la principal controversia de este caso. Esto, no en el marco de un recuento (Art. 6.011 de la Ley Electoral, supra) al que es claro que ninguno de los dos candidatos tiene derecho, sino en el contexto del Art. 6.012 de la mencionada ley, supra.
Ahora bien, este término de diez días del referido Art. 1.016 de la Ley Electoral es de naturaleza jurisdiccional.(56) Siendo así, y en un forzoso escrutinio de nuestra jurisdicción, nos corresponde, en primer lugar, determinar si el foro de instancia tenía jurisdicción al emitir su sentencia.
Además, el mencionado Art. 1.016 dispone que, ante una solicitud de revisión, el foro primario deberá celebrar una vista en su fondo en la que recibirá evidencia y formulará las determinaciones de hechos y conclusiones de derecho que correspondan. Esto es, la revisión de las decisiones de la C.E.E. —por parte del foro primario— se hace mediante un juicio de novo.(57)
En el caso particular de una controversia de naturaleza electoral, más que una simple revisión del expe *65 diente administrativo de un procedimiento anterior ante la C.E.E., el juicio de novo consiste de un enjuiciamiento amplio y completo de las controversias del caso. Por ende, puede producirse nueva prueba documental y testifical, lo que implica que todos los extremos pertinentes y relativos a los planteamientos estarán abiertos a la consideración del tribunal revisor como si se plantearan por primera vez.(58)
Por otro lado, ya hemos expresado de manera reiterada que, en ausencia de error manifiesto, pasión, prejuicio o parcialidad, los foros apelativos no intervendremos con las determinaciones de hecho, la apreciación de la prueba y las adjudicaciones de credibilidad efectuadas por el foro primario.(59)
En lo pertinente, la Regla 43.2 de Procedimiento Civil(60) establece que “[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos”. Tomando esta norma como base, usualmente los tribunales apelativos no intervenimos ni alteramos innecesariamente las determinaciones de hechos que hayan formulado los tribunales de primera instancia luego de admitir y aquilatar la prueba presentada durante el juicio.(61) Además, un foro apelativo no puede descartar y sustituir las determinaciones tajantes y ponderadas del foro de instancia por sus propias apre *66 ciaciones, basadas en un examen del expediente del caso.(62)
En el presente caso, el foro primario, en su “Resolución sobre moción para desestimar” emitida el 5 de febrero de 2009, reseñó que —para aclarar las incongruencias con relación a las fechas de las notificaciones de la Resolución CEE-RS-08-125— había señalado una vista “donde compareció el señor Secretario de la C.E.E. y fue interrogado por las partes para aclarar las dudas sobre prescripción en este caso”. (Enfasis suplido.)(63) En esa misma resolución, el foro de instancia fue tajante y enfático en sus determinaciones de hechos al establecer que “[e]l propio Secretario de la C.E.E. notificó a estos dos (2) interesados [Suárez Cáceres y Rodríguez Otero] por considerarlos partes interesadas, todo ello de conformidad con instrucciones del Presidente de la C.E.E.”. (Énfasis suplido.)(64)
Sin embargo, el foro apelativo intermedio insistió en su conclusión de que el Secretario de la C.E.E. actuó ultra vires porque, según el tribunal a quo, él fue quien determinó que las partes aquí involucradas, el peticionario (Suárez Cáceres) y el recurrido (Rodríguez Otero), eran partes interesadas.(65) Al colegir de esta manera, es evidente que el tribunal intermedio descartó —sin determinación previa de error manifiesto, pasión, prejuicio o parcialidad en la decisión del foro primario— un hecho que fue parte de la prueba presentada y que el juez de instancia estimó que debía perpetuarse como una determinación de *67 hechos. Al así hacerlo, el Tribunal de Apelaciones incumplió con el mandato procesal que establece que “[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el Tribunal Sentenciador para juzgar la credibilidad de los testigos”.(66)
La determinación de hechos que expone que el Secretario de la C.E.E., al notificar a Suárez Cáceres la Resolución CEE-RS-08-125, actuó en conformidad con las instrucciones que recibió del Presidente de la C.E.E., no ha sido refutada por ninguna de las partes recurridas. De hecho, Rodríguez Otero, en su alegato como parte recurrida, confirma lo que fue el testimonio del Secretario de la C.E.E., al señalar que “tanto en su testimonio oral así como las certificaciones de la CEE incluidas en los Apéndices de este Recurso, el Secretario de la CEE indicó que él fue quien hizo las posteriores notificaciones de dicha Resolución [CEE-RS-08-125] y que él firmaba las certificaciones sin cuestionarlas o revisarlas. Según él, sólo era suficiente que el Presidente de la CEE se lo indicara para hacerlo”. (Enfasis suplido.)(67) Siendo así, no hay duda de que tales expresiones sí fueron parte del testimonio ofrecido por el Secretario de la C.E.E. ante el juez de instancia.
El asunto se traduce a un asunto de credibilidad; esto es, si tal expresión del Secretario de la C.E.E. es o no creíble. Hemos señalado que la determinación de credibilidad del tribunal sentenciador debe ser merecedora de gran deferencia por parte de los foros apelativos, por cuanto es el juez de instancia quien —de ordinario— está en mejor posición para aquilatar la prueba testifical desfilada, ya que fue quien oyó y vio declarar a los testigos.(68) Más aún, *68 el juez ante quien declaran los testigos es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos, contradicciones y todo su comportamiento mientras declaran. Estos factores van formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad.(69) “ ‘[L]a declaración de un testigo no contradicho sobre un hecho determinado, debe merecer crédito, a no ser que su versión sea físicamente imposible, inverosímil o que por su conducta en la silla testifical se haga indigno de crédito.’ ”(70)
En el caso de autos, el juez de instancia creyó el testimonio del Secretario de la C.E.E. de que fue él quien hizo las posteriores notificaciones de la resolución CEE-RS-08-125. Esa expresión no fue ni ha sido rebatida y no encontramos nada inverosímil en ésta. Por todo lo anterior, concluimos que el Tribunal de Apelaciones erró al descartar tal determinación de hechos del juez de instancia.
Por otra parte, el inciso (e) del Art. 1.006 de la Ley Electoral, 16 L.P.R.A. see. 3014, establece lo siguiente:
Todo acuerdo de la Comisión Estatal de Elecciones deberá ser aprobado por unanimidad de los votos de los Comisionados presentes al momento de efectuarse la votación. Cualquier cuestión sometida a la consideración de dicha Comisión que no recibiere tal unanimidad de votos será decidida, en pro o en contra por el Presidente cuya decisión se considerará como la decisión de la Comisión Estatal de Elecciones y podrá apelarse en la forma provista en este subtítulo. (Énfasis suplido.)
En la expedición de la Resolución CEE-RS-08-125 no hubo la unanimidad de los comisionados electorales, según se requiere en el citado artículo. Por consiguiente, todo lo concerniente a la mencionada resolución fue decidido por el Presidente de la C.E.E. y tal dictamen se considera —para todos los efectos— “la decisión de la Comisión”. Es una *69 máxima reconocida en el derecho puertorriqueño que “ ‘el que puede lo más, puede lo menos’’ ”.(71) Es evidente que en el caso de autos, el Presidente de la C.E.E. tenía la autoridad no sólo para disponer finalmente del asunto en sus méritos (que es “lo más”), sino también para decidir a qué partes se les notifica (que es “lo menos”). Como establece la Ley Electoral, supra, en tales circunstancias esa deberá considerarse como la decisión de la C.E.E. Después de todo, la notificación no es un asunto separado, sino parte crucial del trámite de la decisión tomada por el Presidente a nombre de la C.E.E.
Al considerar, entonces, que la C.E.E. notificó a unas partes en una fecha —30 de diciembre de 2008— y a otras partes afectadas en otras fechas —7 y 9 de enero de 2009— surge la circunstancia de un desfase en las fechas de las notificaciones, lo que constituye un defecto en el proceso de la notificación por parte de la C.E.E.
Reiteradamente hemos señalado que la adecuada notificación constituye un requisito fundamental del debido proceso de ley, por lo que la falta de notificación de una resolución administrativa enerva esa garantía constitucional.(72) Esto, ante la realidad de que la falta de una notificación adecuada podría afectar el derecho de una parte a cuestionar una resolución o sentencia.(73)
Como norma general, todas las partes en un proceso administrativo tienen que ser notificadas de la resolución mediante la cual se adjudica la controversia presentada ante el organismo administrativo. No es hasta que se haya efectuado una notificación a todas las partes a la vez que comienzan a transcurrir los términos jurisdiccionales para solicitar la reconsideración y acudir en revisión al foro correspondiente.
*70 No obstante, aunque una notificación defectuosa impide que transcurra el término para acudir en revisión judicial, hemos resuelto que en el caso de agencias administrativas ese término quedará sujeto a la doctrina de incuria.(74) Siendo así, y considerando que Suárez Cáceres presentó su solicitud de revisión dentro del término de diez días (contado a partir de la fecha en que le fue notificada la resolución por parte del Presidente de la C.E.E.), no hay duda de que el foro primario tenía jurisdicción para atender el asunto y así la ejerció. Por todo lo anterior, erró el Tribunal de Apelaciones al señalar que el tribunal de instancia no tenía jurisdicción para atender el escrito de revisión presentado por Suárez Cáceres.
III

El caso “Sánchez y Colón v. E.L.A. F

Como sabemos, el derecho al voto es una de las garantías fundamentales de nuestro ordenamiento constitucional.(75) El carácter fundamental y preeminente de este derecho en el orden constitucional federal ha sido reconocido en reiteradas ocasiones por el Tribunal Supremo de Estados Unidos.(76)
La Constitución de Puerto Rico expresamente señala que “ [1] as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral”. (Enfasis suplido.)(77) Como vemos, al establecer el derecho al *71 voto, el Art. II, Sec. 2 de la Constitución de Puerto Rico, supra, lo entrelaza con su propósito ulterior: garantizar la expresión libre de la voluntad ciudadana.(78) El derecho al voto, como instrumento del derecho a la libre expresión, comprende no sólo la prerrogativa de un ciudadano de votar por los candidatos o las opciones de su predilección, sino el derecho de acudir a la urna y depositar la papeleta en blanco o dañarla, si ese es su deseo o empeño.
Como ya reseñamos, en su memorando en oposición al recurso que nos ocupa, el recurrido Rodríguez Otero ex-presó que este Tribunal resolvió la controversia sobre cómo se computan las papeletas en blanco, las protestadas, las nulas y las de nominación directa de personajes ficticios en Sánchez y Colón v. E.L.A. I, supra. Ciertamente, en el mencionado caso ordenamos que las papeletas en blanco fueran adjudicadas como un voto que no favorecía a ninguna de las opciones de status político para Puerto Rico.(79)
Al así hacerlo, nos basamos en el derecho fundamental y preeminente al sufragio, reconocido tanto en nuestro ordenamiento constitucional como en el de Estados Unidos de América. En esa ocasión, también señalamos que tal derecho al sufragio universal estaba protegido constitucionalmente tanto en las elecciones generales como en los referéndum y en los plebiscitos.(80) Por lo tanto, es preciso concluir, por puro silogismo jurídico, que la intención de un elector que vota mediante una papeleta en blanco, es ex-presar su inconformidad con los candidatos en la papeleta; en otras palabras, es la intención del elector de no favorecer a ningún candidato.
Ahora bien, una de las consecuencias de la decisión que emitimos en Sánchez y Colón v. E.L.A. I, supra, como lo planteara el Juez Asociado Señor Rebollo López en su opi *72 nión disidente, es que la adjudicación de esa papeleta en blanco afecta seriamente o diluye el efecto y la consecuencia de los votos que se emiten a favor de las opciones presentes en la papeleta.(81) Considerando todo lo anterior y ante el efecto que tal normativa jurisprudencial acarrea, es menester reconsiderar.
Razonablemente podemos concluir que el elector que voluntariamente daña su papeleta, la deposita en blanco o vota por algún personaje ficticio, tuvo la clara intención de no favorecer ninguna opción o candidato de los que se encontraban en la papeleta; la razonabilidad y el sentido común nos persuaden a concluir de tal forma.
No obstante, con relación a ese elector, podríamos reflexivamente interpretar lo que no quiere —esto es, no favorecer lo que está en la papeleta— pero no tenemos base alguna para interpretar lo que sí quiere, a no ser, simplemente, ejercer su derecho a expresarse. Ese derecho, sin embargo, aunque es respetable, no es el propósito de una elección ni de una papeleta.(82) Como señaló el Tribunal Supremo de Estados Unidos en Burdick v. Takushi, 504 U.S. 428 (1992):
[t]here are other means available, however, to voice such generalized dissension from the electoral process; and we discern no adequate basis for our requiring the State to provide and to finance a place on the ballot for recording protests against its constitutionally valid election laws.(83)
El propósito de la elección general es elegir a “to-dos los funcionarios que, conforme la Constitución de Puerto Rico y otras leyes especiales, deban ocupar cargos públicos de elección popular en el Estado Libre Asociado de Puerto Rico”.(84)
*73 De esta forma, lo justo es que en todo evento electoral —ya sea por voto directo o por proporcionalidad— quienes finalmente elijan sean aquellos ciudadanos cuya intención clara e inequívoca fue votar por uno de los candidatos o de las propuestas presentadas en la papeleta.
Utilizar la expresión —o sea, el voto— de aquellos cuya intención fue no favorecer a ningún candidato, para precisamente patrocinar la elección de uno de ellos, es ir en contra de lo único de lo que tenemos razonable certeza, que fue la intención de ese elector.(85) El derecho al sufragio y a la libre expresión, ambos consagrados en nuestra Constitución, garantizan el derecho del elector a expresarse y a votar por lo que crea. No debe utilizarse para que se cuente —ya sea a favor o contra candidato u opción alguna— si su intención claramente ha sido lo contrario.
De esta manera, somos más consecuentes con lo resuelto en Suárez v. C.E.E. I, 163 D.P.R. 347 (2004). En esa ocasión, resolvimos que “al evaluar un voto debe ser norma irreducible la de evaluarlo con el mayor respeto a la voluntad del elector y con el óptimo esfuerzo por salvar su intención, si ésta encuentra apoyo en la inteligencia aplicada al examen de la papeleta ...”.(86)
Considerando lo anterior, nos reiteramos en que la intención de un elector que deposita su papeleta en blanco, que anula voluntariamente su papeleta o que vota por nominación directa a favor de un personaje ficticio, es expresar su inconformidad, ya sea con las propuestas presentadas o con los candidatos disponibles en ésta. No obstante, tal voto de ninguna manera puede ser contado para *74 efectos de influir o afectar el resultado de una elección, referéndum o plebiscito, entre otros eventos electorales. Y es que, como se señala en Burdick v. Takushi, supra, pág. 438, “[attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently”. Por todo lo anterior, revocamos la norma establecida en Sánchez y Colón v. E.L.A. I, supra.
IV
A. La expresión “votos depositados” a la luz del inciso (b) de la See. 7 del Art. Ill de la Constitución de Puerto Rico
Antes de entrar a considerar la expresión “votos depositados” en el contexto enunciado, es menester evaluar jurídicamente la actuación de la C.E.E. con relación a la Resolución CEE-RS-2008-04 y su contraparte, la Resolución CEE-RS-2008-125.
Hemos expresado que entre los principales supuestos que inspiraron los valores jurídicos y comunitarios que entrañan nuestra Ley Electoral se encuentran: (1) las normas y reglas referentes a toda contienda electoral, y la forma de contar el sufragio, deben quedar establecidas previamente, de manera que todos los candidatos y partidos políticos sepan a qué atenerse, y (2) no se debe introducir cambios posteriores que afecten adversamente tales reglas, concediendo ventajas impermisibles a unos sobre otros.(87)
En varias instancias durante este complicado proceso, la C.E.E. ha admitido que aprobó una normativa (CEE-RS-2008-04) y que después no la siguió o, lo que es lo mismo, que incumplió con ésta.(88) Luego, por voz de su Presidente *75 y mediante la Resolución CEE-RS-2008-125, la C.E.E. pretendió —retroactivamente— cambiar el estado de derecho vigente a la fecha de las elecciones, estado sobre el cual descansaron ambos candidatos, como bien señaló el foro primario. Tal acción tuvo un efecto latente pues, como lo certifica la propia C.E.E., afectó los resultados aquí en controversia. Sin duda, tales maniobras por parte de la C.E.E. incumplen con los supuestos que inspiraron los valores jurídicos y comunitarios que entrañan nuestra Ley Electoral.
Por otra parte, la premisa básica de nuestro ordenamiento constitucional es que la mayoría gobierna mediante sus representantes electos, tanto en la Rama Ejecutiva como en la Rama Legislativa. Sin embargo, el Art. Ill, Sec. 7 de la Constitución de Puerto Rico, supra, también incorporó, a través de la “Ley de Minorías”,(89) un innovador mecanismo para garantizar la representación efectiva de las delegaciones minoritarias en la Legislatura. Esta garantía constituye un elemento indispensable en un gobierno democrático constitucional como el nuestro. No obstante, esta garantía se activa sólo bajo determinadas circunstancias y no siempre le asegura a los partidos de minoría un número de escaños igual a la tercera parte del número total de miembros.(90)
Del Diario de Sesiones de la Convención Constituyente de Puerto Rico surgen claramente dos elementos que controlaron el ánimo de sus integrantes al momento de adoptar la llamada “Ley de Minorías”: en primer lugar, no restarle efectividad a los esfuerzos que tuviera a bien pro-mover el partido seleccionado por el Pueblo como partido mayoritario y, en segundo lugar, proveer a los partidos de *76 minoría la coyuntura de encarnar con efectividad los intereses de los grupos de opinión que representan, de manera que realicen la importante labor de fiscalizar la gestión del Gobierno.(91)
Entonces, se dispuso que el mecanismo adoptado aplicaría sólo en aquellos casos en que un solo partido obtuviera más de dos terceras partes de los escaños de cualquiera o ambas cámaras legislativas. En estos casos, se aseguró que el partido así seleccionado por el voto directo del Pueblo no perdiera su estado como partido mayoritario. Para ello se dispuso que, al aplicar la fórmula, el número de legisladores por el o los partidos de minoría nunca excedería una tercera parte del número original del cual estaba compuesta cada cámara. En el caso del Senado, por lo tanto, la composición de los miembros de los partidos de minoría sería de nueve, ello en los casos que aplicara la disposición constitucional. Este número constituye el mínimo que se le quiso garantizar a los partidos de minoría.(92)
En lo pertinente, el inciso (b) de la See. 7 del Art. Ill de la Constitución de Puerto Rico establece, en lo pertinente, lo siguiente:
Para seleccionar los candidatos adicionales de un partido de minoría, en cumplimiento de estas disposiciones, se considerarán, en primer término, sus candidatos por acumulación que no hubieren resultado electos, en el orden de los votos que hubieren obtenido y, en segundo término sus candidatos de distrito que, sin haber resultado electos, hubieren obtenido en sus distritos respectivos la más alta proporción en el número de votos depositados en relación con la proporción de los votos depositados a favor de otros candidatos no electos del mismo partido para un cargo igual en otros distritos. (Enfasis suplido.)(93)
*77 Al interpretar, en su contexto más próximo y contiguo, la expresión constitucional que nos ocupa, y como fundamento adicional a lo aquí resuelto con relación al caso Sánchez y Colón v. E.L.A. I, supra, es evidente que no fue la intención de nuestra Asamblea Constituyente incluir ese tipo de voto dentro de la ecuación que establecería la proporcionalidad de cada candidato por distrito, para efectos de su posición ante la aplicación de la “Ley de Minorías”. Así surge claramente del texto:
... candidatos de distrito que, sin haber resultado electos, hubieren obtenido en sus distritos respectivos la más alta proporción en el número de votos depositados en relación con la proporción de los votos depositados a favor de otros candidatos no electos del mismo partido para un cargo igual en otros distritos. (Énfasis suplido.) Art. Ill, Sec. 7(b), Const. E.L.A., supra, pág. 385.
Nótese que el texto es claro en el sentido de que la proporción de los votos se establecerá a base de los votos depositados “a favor del” candidato de ese distrito vis-á-vis los votos depositados “a favor de” su contendiente en otro distrito. Otra tendría que ser la interpretación si nuestra Asamblea Constituyente hubiera redactado la oración sin hacer distinción con relación a qué votos depositados debían contarse, o sea, si se hubiera expresado de la manera siguiente: candidatos de distrito que, sin haber resultado electos, hayan obtenido en sus distritos respectivos la más alta proporción de los votos depositados, en relación con la proporción de los votos depositados en los distritos de otros candidatos no electos del mismo partido para un cargo igual.
Nuestra Asamblea Constituyente fue clara al establecer que sólo serían considerados los votos depositados a favor de cada uno de los candidatos en sus respectivos distritos. Aunque, como hemos advertido, el texto de la mencionada disposición constitucional es claro, de un examen del Diario de Sesiones de la Asamblea Constituyente no encontramos nada que nos mueva a pensar que la interpretación *78 aquí refrendada no fue el designio de los redactores de nuestra Constitución. Y es que lo anterior es lo que se ciñe a lo justo y a lo sensato.
B. La interpretación del inciso (2) del Art. 6.012 de la Ley Electoral de Puerto Rico
En lo pertinente, el inciso (2) del Art. 6.012 de la Ley Electoral, supra, dispone que:
Al aplicar el párrafo antepenúltimo de la Sección 7 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, se descartará y no se considerará fracción alguna que sea menos de la mitad de uno; y en el caso que resulten dos fracciones iguales, la Comisión Estatal de Elecciones procederá a hacer la determinación en cuanto al candidato que debe certificarse elect [o], ... mediante sorteo en la forma dispuesta por la Comisión mediante reglamento. (Enfasis suplido.)
En nuestro entorno jurídico es norma reconocidísima de hermenéutica judicial que “[c]uando la ley es clara libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu”.(94) Como corolario de lo anterior y considerándolo como un asunto prioritario, al interpretar un estatuto debemos remitirnos al texto de la ley, pues cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa.(95)
Por otro lado, este Tribunal ha reconocido que la interpretación de un estatuto por el organismo que lo administra y es responsable de su cumplimiento, merece gran respeto y deferencia judicial.(96) Incluso, en casos marginales o dudosos, la interpretación de un estatuto que *79 hace la agencia encargada de velar por su cumplimiento merece una gran deferencia, aun cuando esa interpretación no sea la única razonable.(97)
Ahora bien, no cabe hablar de deferencia judicial cuando la interpretación de la agencia afecta derechos fundamentales, resulta irrazonable o conduce a la comisión de injusticias.(98) Asimismo, cuando la agencia interpreta el estatuto al que está obligada a poner en vigor, de forma tal que produce resultados contrarios al propósito de la ley, esa interpretación no puede prevalecer.(99)
El Art. 6.012 de la Ley Electoral, supra, encuentra su raíz y razón de ser en el Art. Ill, Sec. 7 de la Constitución de Puerto Rico, supra. Como explicamos, esta See. 7 establece las maneras para determinar el número de legisladores que entrarán por adición si se dan las circunstancias que precisa la propia Constitución. La parte que nos ocupa de la referida See. 7, esto es, el inciso (b), obedece lógicamente al hecho de que la diferencia de densidad electoral que existe entre los distintos distritos traería como resultado el que siempre resultaran electos los candidatos por los distritos de mayor densidad electoral.
El mencionado inciso (2) y, específicamente, el penúltimo párrafo del Art. 6.012 de la Ley Electoral, supra, dispone la fórmula en que habrán de ser seleccionados los candidatos específicos, de entre los no electos de cada partido, para ocupar escaños por adición.(100) En esta fase peculiarísima del proceso utilizado para adjudicar los escaños adicionales es que entra en vigor la fórmula de la “Ley de Minorías”.
De una simple lectura del mencionado artículo de la Ley *80 Electoral entendemos que es clara la forma en que el legislador estableció que se debía trabajar con las importantes fracciones. Esto es, que al aplicarse el párrafo antepenúltimo de la See. 7 del Art. Ill de la Constitución de Puerto Rico, supra, se descartaría y no se consideraría fracción alguna que sea menos de la mitad de uno. En su alegato, la parte recurrida lo afirma de la manera siguiente: “[e]se artículo sólo ‘permite’ la eliminación de fracciones de me-nos de 50% de candidatos en la proporción de votos en relación con la proporción de los votos depositados a favor de otros candidatos no electos.” (Enfasis suplido.)(101) Esto es, si la fracción es de .50 o más, esa fracción prevalece, mientras si la fracción es de .49 o menos entonces esa fracción no se considera y el número se redondea al número entero más cercano a la fracción. Resulta interesante destacar que la C.E.E. cuenta con una tradición interpretativa de esta fórmula, similar a la interpretación antes expuesta, que data de más de 50 años. Veamos.
En 1956, el Sr. Rodolfo Ramírez Pabón, superintendente general de elecciones de la Junta Estatal de Elecciones —actualmente, la C.E.E.— refirió al Secretario de Justicia de Puerto Rico (Secretario de Justicia) dos consultas que involucraban el asunto que consideramos en esta ocasión.(102) La ley vigente en aquel momento(103) incluía la misma expresión que incluye el Art. 6.012 de la Ley Electoral, supra.(104) En la primera de las consultas (Op. See. *81 Just. Núm. 1956-81), se le cuestionó al Secretario de Justina con relación a los resultados de dos candidatos del mismo partido (Partido Estadista Republicano), al que le correspondía la aplicación de los beneficios de la “Ley de Minorías”. Estos dos candidatos habían corrido por el mismo distrito (San Juan) y su diferencia en votos era de apenas un solo voto (30,970 frente a 30,969). Lo pertinente es que sus números, en términos proporcionales o de equivalencia, eran de 30.7675% para uno y 30.7665% para el otro.(105) En la opinión, y con relación a esas proporciones, el Secretario de Justicia señaló lo siguiente:
Obsérvese que las fracciones que obtenemos en ambos casos no pueden considerarse fracciones menores de la mitad de uno a los fines de aplicar la regla de la sección 89(a), supra, al efecto de que “no se considerará fracción alguna que sea menos de la mitad mas uno ...”. Tampoco se requiere la aplicación de la regla al efecto de que “en el caso de que resulten dos fracciones iguales la Junta Insular [Estatal] de Elecciones procederá a hacer la determinación en cuanto al candidato que debe certificarse al Gobernador mediante un sorteo ...”, toda vez que consideradas como .7675 frente a .7665 ó 77260/100658 frente a 77160/100658, las fracciones en el caso de un candidato en contraste con las del otro no pueden considerarse iguales. (Enfasis suplido y en el original.)(106)
La segunda opinión solicitada al Secretario de Justicia (Op. Sec. Just. Núm. 1956-82) hacía referencia a dos candidatos del mismo partido, que habían obtenido proporciones de 30.8814% y 30.7754%, respectivamente. Distinto a la situación que se presentó en la Op. Sec. Just. Núm. 1956-81, los candidatos en esa ocasión habían corrido por distritos senatoriales distintos; el que obtuvo 30.8514% había corrido para representante por el precinto de Río Pie *82 dras I, mientras el que obtuvo 30.7754% había corrido por el distrito de Aguadilla-Isabela.(107)
En ese caso, el Secretario de Justicia nuevamente indicó que, ya que las fracciones no habían sido menores de la mitad de uno y que tampoco podían considerarse iguales, no había base para aplicar la regla provista por ley para casos de empate. Finalmente, éste recomendó a la Junta Estatal de Elecciones que certificara al candidato del precinto de Río Piedras I, quien había obtenido 30.8514%.(108)
Por último, debemos considerar una tercera Opinión del Secretario de Justicia.(109) Cuatro años después de las opiniones previamente discutidas, en 1960, el Ledo. Ernesto Mieres Calimano, superintendente general de elecciones, le refirió al Secretario de Justicia la que se convirtió en la Opinión Núm. 1960-82.(110) En esa ocasión, y en lo pertinente, surge que los candidatos que habían llegado en las posiciones décima y undécima habían obtenido 38.24% y 38.23%, respectivamente. Con relación a éstos, el Secretario de Justicia señaló lo siguiente:
Obsérvese que en el único caso en que, técnicamente, ocurriría un empate —al descartar las fracciones menores de la mitad de 1— es entre los candidatos que ocupan el décimo y el undécimo lugar, con la siguiente proporción, respectivamente: 38.24% y 38.23%. Al quedar ambos en 38.00%, habría que seleccionar uno de ellos, utilizando la regla provista para un “empate” en la propia sección 89(a) ,...(111)
Como vemos, las tres opiniones del Secretario de Justicia son claras. Hemos resuelto que las opiniones del Secretario de Justicia —amén de consignar formalmente el *83 criterio del funcionario ejecutivo de más alto rango en el ámbito de la administración de la justicia— ostentan un gran valor persuasivo, muy en particular para los organismos administrativos.(112)
Como norma general reiterada, los funcionarios públicos se adhieren al curso señalado por estas opiniones. Esta es la razón por la cual tales opiniones gozan de un marcado valor persuasivo. Así, aunque no alcanzan la autoridad mandatoria que tiene la jurisprudencia de este Tribunal, se apunta que “[s]on prácticamente vinculantes para los organismos administrativos”.(113) En vista de lo anterior, no entendemos por qué razón en este caso la C.E.E. no se sujetó a las tres opiniones del Secretario de Justicia antes citadas. Máxime cuando, con relación a los hechos de autos, ésta ha sido la norma que la propia agencia ha seguido por más de cincuenta años.
En conclusión, por mandato de ley, ninguna fracción superior a .49 puede ser eliminada y el empate que produciría un sorteo sólo se da en una de dos circunstancias: (1) cuando por ser las fracciones menores de .49%, la Ley Electoral obligue a que ambos números se redondeen al número entero más cercano a la fracción, o (2) cuando las fracciones que —por motivo de la misma Ley Electoral— no pueden eliminarse, resultan casualmente ser las mismas.
Considerando que en el caso de autos, según nos certifica la propia C.E.E., los por cientos proporcionales de los dos candidatos —excluyendo las papeletas en blanco, las nulas y las de nominación directa de personajes ficticios— es de 22.8481% para el recurrido Rodríguez Otero y de 22.8526% para el peticionario Suárez Cáceres, no hay duda de que el sorteo ordenado por la C.E.E. no procede y que es *84 a Suárez Cáceres a quien le corresponde el escaño senatorial.
Siendo que, ante el análisis aquí expuesto, el resultado enunciado es el único posible, y considerando la urgente necesidad de que el único partido de oposición con representación en el Senado de Puerto Rico complete a la breve-dad posible la delegación que por derecho constitucional le corresponde, nos corresponde ordenar al foro administrativo que certifique al peticionario Suárez Cáceres como miembro por adición del Senado de Puerto Rico.
V
Por los fundamentos antes expuestos, se revoca la sentencia del Tribunal de Apelaciones, Región Judicial de San Juan, se reinstala la sentencia del Tribunal de Primera Instancia, Sala de San Juan, mediante la cual se declaró inválida la Resolución CEE-RS-08-125 de la Comisión Estatal de Elecciones y se devuelve el caso a ese organismo administrativo para que, inmediatamente y en conformidad con la aquí pautado, certifique al señor Jorge Suárez Cáceres como miembro por adición del Senado de Puerto Rico, de manera que éste pueda juramentar a su cargo a la brevedad posible.

Se dictará Sentencia de conformidad.

El Juez Asociado Señor Martínez Torres emitió una opinión de conformidad, a la cual se unieron el Juez Asociado Señor Rivera Pérez y la Jueza Asociada Señora Pabón Charneco. El Juez Presidente Señor Hernández Denton, la Jueza Asociada Señora Fiol Matta y la Juez Asociada Señora Rodríguez Rodríguez emitieron sendas opiniones disidentes.
*85 Opinión de conformidad emitida por el
Juez Asociado Señor Martínez Torres, a la cual se unen el Juez Asociado Señor Rivera Pérez y la Jueza Asociada Señora Pabón Charneco.
Me atrevo a aseverar que no soy el único puertorriqueño sorprendido por la posición de la Comisión Estatal de Elecciones, por voz de su Presidente y avalada por las opiniones disidentes, que postula que se adjudiquen en las elecciones generales los votos emitidos por personajes ficticios, como por ejemplo, el Pato Donald o el Payaso Trompetilla. Tampoco debo ser la única persona que no alcanza a comprender cómo se puede adjudicar a favor de algo o alguien una papeleta en blanco que, en esencia, es un voto por nada ni nadie. Es imposible adjudicar la intención afirmativa del elector que deposita su papeleta enblanco, a menos que se pretenda que los funcionarios de colegio tengan la habilidad del ficticio personaje de comedia de Johnny Carson —Carnac el Magnífico— que con tan sólo pegarse a su frente un sobre conocía el contenido de la carta que estaba adentro.
En realidad, ningún mentalista —real o ficticio— y mucho menos un tribunal, puede adjudicar un voto en blanco a favor de candidato alguno. Tampoco puede adjudicar como válido el voto por alguien que no existe. Lo único que puede hacerse con esa papeleta es, como se advierte en la opinión del Tribunal, contabilizarla como lo que es, una papeleta en blanco o por un personaje ficticio. La interpretación de la intención de cada elector que depositó cada una de esas papeletas en la urna electoral está sujeta a interpretación.
La expresión de esos electores —cualquiera que ella sea— está garantizada en la opinión de este Tribunal. “[S]e harán constar como papeletas en blanco y así figurarán en *86 la hoja de cotejo.” Art. 6.001 de la Ley Electoral de Puerto Rico (Ley Electoral), Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.P.R.A. see. 3261. Lo que no se garantiza, porque es imposible, es que se adjudiquen esas papeletas a favor de candidato alguno. Es decir, se contabilizarán pero, por ser nulas, no se adjudicarán a los efectos del resultado electoral. Art. 1.003(35) de la Ley Electoral, 16 L.P.R.A. see. 3003(35). Por definición, una “papeleta en blanco” no es un voto adjudicable, como erróneamente sostienen las opiniones disidentes, sino todo lo contrario: una papeleta “que habiendo sido depositada en la urna por el elector no tenga marca alguna de votación”. Art. 1.003(30) de la Ley Electoral, 16 L.P.R.A. see. 3003(30). En cambio, una “papeleta adjudicada” es “aquella votada por el elector y aceptada como válida por la Junta de Colegio”. Art. 1.003(29) de la Ley Electoral, 16 L.P.R.A. see. 3003(29). Por esa razón, las papeletas depositadas en blanco no pueden considerarse como “votos depositados” para determinar la proporción entre los candidatos de un partido político que se disputan un escaño legislativo por adición, según lo dispuesto en el Art. Ill, Sec. 7 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1. Adjudicar esas papeletas en blanco o con votos por personajes ficticios diluiría los votos válidos que se emitieron en los distritos senatoriales de Guayama y Humacao a favor de los candidatos del Partido Popular Democrático que se disputan el escaño por adición que le corresponde a ese partido.
Por eso, los más sorprendidos con las opiniones disidentes deben ser los electores que votaron por esos candidatos. De haber prevalecido la posición disidente en este Tribunal, la representación adicional que la Constitución le garantiza a esos electores se quedaría como hasta ahora, vacante, pero por tiempo indefinido. La disidencia señala que la decisión mayoritaria “trastoca los valores democráticos más elementales de los cuales se nutre nuestra sociedad”, *87 aunque ésta acaba sin demora con la triste realidad de una representación legislativa incompleta. Opinión disidente del Juez Presidente Señor Hernández Denton, pág. 93.
La opinión del Tribunal garantiza con celeridad la representación de la minoría en el Senado, para cumplir con el mandato de la Constitución y como reconocimiento del papel crucial que representa la minoría en nuestro sistema. “[E]s básico para la salud democrática que las minorías tengan una representación que, aun bajo las circunstancias más desfavorables, les permita cumplir adecuadamente su función de fiscalizar y estimular a la mayoría en su obra de gobierno sin crear entorpecimientos que puedan resultar en detrimento de la democracia.” Informe Complementario de la Comisión de la Rama Legislativa, 4 Diario de Sesiones de la Convención Constituyente 2590 (1961), citado con aprobación en Silva v. Hernández Agosto, 118 D.P.R. 45, 70 (1986). A pesar de ello, se aduce que la opinión del Tribunal lleva la democracia por un “desolado y escarpado camino”. Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 122.
Los candidatos en disputa también deben estar sorprendidos de que se diga que no existe una disputa real entre ellos que justifique nuestra intervención. Opinión disidente del Juez Presidente Señor Hernández Denton, pág. 96. La silla vacía de la minoría en el Senado es evidencia de lo contrario.
En su ponencia, el hermano Juez Presidente Señor Hernández Denton anticipa que en definitiva, de entrar en los méritos de la controversia, lo que procedería sería certificar al otro candidato, el Sr. Ángel Rodríguez Otero, porque la proporción mayor del total de votos le favorece. Con todo respeto, considero inaceptable esa postura. Según la Comisión Estatal de Elecciones (C.E.E.), los votos que inclinarían la balanza hacia el candidato Rodríguez Otero son los votos en blanco y por personajes ficticios. No puedo aceptar que los votos por el Pato Donald o su novia Daisy, por Juan *88 Bobo, por el Hombre Araña o por nadie, sean los que decidan un escaño por adición en el Senado de Puerto Rico.
Tampoco es determinante que el candidato Rodríguez Otero obtuviera más votos que el candidato Suárez Cáceres. No podemos pasar por alto que estos candidatos no compitieron entre sí, sino por escaños en diferentes distritos. Lo único que la diferencia en votos indica es que el total de votos por los candidatos al Senado fue mayor en el Distrito Senatorial de Guayama que en el Distrito Senatorial de Humacao. Para atender el efecto de esas diferencias, el Art. Ill, Sec. 7 de la Constitución, supra, ordena que la representación legislativa por adición se determine a base de la “proporción en el número de votos depositados en relación con la proporción de los votos depositados a favor de otros candidatos no electos del mismo partido para un cargo igual en otros distritos”. Aquí no aplica el mandato del Art. VI, Sec. 4 de la Constitución de Puerto Rico, de que se declarará electo al candidato que obtenga el número mayor de votos, ya que no compitieron para el mismo cargo. Fuster v. Busó, 102 D.P.R. 327, 343 (1974).
Más aún, se imputa también a este Tribunal que hemos modificado las reglas del escrutinio electoral. Opinión disidente del Juez Presidente Señor Hernández Denton, pág. 106. No obstante, el expediente refleja que fue la C.E.E., por voz de su Presidente, la que obvió la Resolución CEE-RS-08-04 que la propia C.E.E. adoptó antes de las elecciones de forma unánime, y que luego pretendió darle efecto retroactivo al cambio de parecer para que se contaran como votos depositados las papeletas en blanco y por personajes ficticios. Véase Resolución CEE-RS-08-125 de 30 de diciembre de 2008. Toda agencia está obligada a observar estrictamente sus reglamentos. García Cabán v. U.P.R., 120 D.P.R. 167, 175 (1987); Hernández García v. J.R.T., 94 D.P.R. 22, 29 (1967). La disidencia, sin embargo, quiere que reconozcamos como válida una práctica que se apartó de la norma de derecho estipulada en la resolución *89 que estaba en vigor el día de las elecciones. De prevalecer esa postura, sería la primera vez que se convalida una actuación de una agencia administrativa que es contraria a su propia reglamentación.
Por otro lado, aunque hace apenas un mes se reclamó(1) que se mantenga la vigencia futura de una opinión que contó con sólo tres votos de este Tribunal —Álvareztorre Muñiz v. Sorani Jiménez, 175 D.P.R. 398 (2009)— hoy se minimiza el valor de la opinión de esta Curia porque se emite por lo que se califica como una “exigua mayoría” de cuatro votos. Opinión disidente emitida por la Juez Asociada Señora Rodríguez Rodríguez, pág. 111.
El grueso de cada una de las opiniones disidentes se dedica a la defensa de la vigencia de la norma establecida en Sánchez y Colón v. E.L.A. I, 134 D.P.R. 445 (1993). Allí se adjudicaron las papeletas depositadas en blanco como votos válidos para determinar la proporción de las fórmulas de status que se le consultaron al Pueblo en el plebiscito de 1993. Apoco se examine el efecto de esa decisión, se advierte por qué es contraproducente a la democracia mantener vigente tan insólito resultado de adjudicar a favor de algo un voto por nada.
Un elector puede depositar su papeleta en blanco por muchas razones. Puede hacerlo porque no coincide con las alternativas que aparecen en la papeleta, pero puede hacerlo también porque no le interesa la elección pero quiere permanecer en las listas electorales, de las cuales sería borrado si no participa. Esa intención no es un interés de emitir un voto de protesta como supuso este Tribunal en Sánchez y Colón v. E.L.A. I, supra. Más bien es un indicador de desinterés. Esa posibilidad es particularmente real en el caso de las primarias y las elecciones generales en Puerto Rico. Por ejemplo, puede que el elector tenga inte *90 rés en votar por un candidato particular a gobernador o alcalde, pero no tenga preferencias por los candidatos al Senado y la Cámara de Representantes, o no le importen esas otras contiendas electorales. Esa es su prerrogativa, porque el elector tiene derecho a no votar por alguien. En ese caso, el mismo elector echa en la urna un voto para gobernador y para alcalde, pero deposita en blanco la papeleta legislativa. Es imposible distinguir esa papeleta de otra en blanco que un elector depositó para protestar del proceso. En otras palabras, no se le puede adscribir a un elector la intención del otro.
Sin embargo, en Sánchez y Colón v. E.L.A. I, supra, este Tribunal diseñó un remedio que en realidad coartó la ex-presión del elector que pretendía defender, para resolver un problema de subinclusión que no existía. Para proteger el derecho de unos electores que supuestamente no favorecían ninguna de las alternativas en el plebiscito, este Tribunal les impuso el significado que quiso a las papeletas depositadas en blanco. Así pues, en lugar de respetar la intención de los electores que votaron con la papeleta en blanco, la que fuese, este Tribunal decidió unilateralmente y sin prueba que esos electores disentían de las alternativas en la papeleta. Véase Sánchez y Colón v. E.L.A. I, supra, pág. 576, opinión disidente del Juez Asociado Señor Rebollo López.
Esa norma no era necesaria. En Burdick v. Takushi, 504 U.S. 428 (1992), el Tribunal Supremo federal rechazó el reclamo de un elector de que tenía un derecho constitucional de expresión y asociación a votar por un candidato distinto a los que aparecían en la papeleta. El peticionario reclamó, incluso, un supuesto derecho constitucional a emitir un voto de protesta por el Pato Donald. Burdick v. Takushi, supra, pág. 438. Al igual que los electores en Sánchez y Colón v. E.L.A. I, supra, se reclamaba el derecho a transmitir un mensaje de desacuerdo con el contenido de la papeleta electoral. En cambio, a diferencia de Sánchez y *91 Colón v. E.L.A. I, supra, el Tribunal Supremo federal no permitió tal cosa.
En esencia, el Tribunal Supremo de Estados Unidos reconoció en su decisión lo que nosotros ya habíamos llamado antes un “interés gubernamental específico —cognoscible y de alta jerarquía en el desarrollo maduro de nuestra democracia— de inyectarle certeza y confianza en la fase de adjudicación al voto, evitando que se generen controversias estériles en torno a cuál fue la verdadera intención de un elector.” (Enfasis suprimido.) P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400, 428-429 (1980).
En las contiendas plebiscitarias, es particularmente nocivo y contrario al mandato constitucional de neutralidad inyectar un elemento totalmente subjetivo y especulativo en la adjudicación de los votos. En un futuro plebiscito cabe la posibilidad razonable de que una fórmula de cam-bio de status político obtenga una proporción de 50% más uno del total de votos. La adjudicación de las papeletas en blanco y por personajes ficticios amplía de manera artificial el universo electoral y reduce la proporción de votos válidos emitidos por las fórmulas en contienda. Ello obstaculiza e impide que se verifique en el escrutinio el mandato mayoritario por un cambio de status. Mientras tanto, la inercia concedería ventaja solamente a la condición existente, que prevalecería vigente al frustrarse por un escrutinio engañoso la voluntad mayoritaria de cambio.
Así pues, la vigencia continuada de la norma de Sánchez y Colón v. E.L.A. I, supra, sería contraria a nuestra postura tradicional de neutralidad en materia de status, pues lo decidido en ese caso tiene el efecto de conceder una ventaja a la condición política existente sobre las alternativas de cambio que compiten en un plebiscito. Por lo tanto, serviría de “retranca” contra cualquier mayoría incipiente que surja a favor de un cambio —cualquiera que éste sea— en la condición política de Puerto Rico. En fin, constituiría lo que en el vocablo pueblerino se llama un “truqueo” que *92 sólo convendría a los que quisieran interferir con la voluntad futura del Pueblo de Puerto Rico. Es eso y no la democracia lo que verdaderamente garantizaría en el futuro la norma establecida en Sánchez y Colón v. E.L.A. I, supra.
En el pasado hemos resuelto que “[l]a Constitución del Estado Libre Asociado no cierra puertas a ningún cambio de status que el pueblo de Puerto Rico desee ...”. P.S.P. v. E.L.A., 107 D.P.R. 590, 606 (1978). Como señaló el ex Gobernador Luis Muñoz Marín, la Constitución del Estado Libre Asociado de Puerto Rico, “[p]or su naturaleza, ni ex-cluye ni implica la estadidad federada, la independencia separada u otra forma de organización política a que nos puedan conducir nuestra voluntad y destino”. Diario de Sesiones, supra, pág. 2555. Por ese motivo, “la ley siempre ha implementado unos mecanismos igualitarios ... proveyendo a todo el electorado del país la opción de poder democráticamente expresar en las urnas su predilección sin que se discrimine contra ninguno de los ideales aludidos”. P.S.P. v. E.L.A., supra, págs. 624-625, opinión concurrente del Juez Asociado Señor Negrón García.
La opinión que emite hoy este Tribunal es cónsona con ese ideal de justicia y comienza a derrumbar las barreras que se erigieron en el pasado al derecho de nuestro Pueblo a escoger su destino final. Con ello se garantiza el desarrollo democrático sobre bases verdaderamente neutrales e igualitarias, con profundo respeto a la voluntad del electorado.
No sé cuál será el rumbo final de ese viaje democrático. Como Tribunal de Justicia, nuestra obligación constitucional y moral es guardar distancia del debate político y dejar que los electores tomen su decisión. Lo que sí es deber de este Tribunal, precisamente para mantener nuestras ma-nos afuera, es aseguramos de no poner piedras en el camino que escoja nuestro Pueblo. Es así que se defiende la democracia.

 García Passalacqua v. Tribunal Electoral, 105 D.P.R. 49, 50 (1976).

 P.P.D. v. Peña Clos I, 140 D.P.R. 779, 812 (1996), opinión concurrente en parte y disidente en parte del Juez Asociado Señor Fuster Berlingeri.

 Const. E.L.A., L.P.R.A., Tomo 1.

 La frase “Ley de Minorías” es la manera en que se le ha llamado al Art. Ill, Sec. 7 de nuestra Constitución, L.P.R.A., Tomo 1. El término fue utilizado por primera vez en P.P.D. v. Peña Clos I, supra, pág. 831.

 Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978); Santa Aponte v. Srio. del Senado, 105 D.P.R. 750 (1977); E.L.A. v. Aguayo, 80 D.P.R. 552 (1958).

 Art. 6.012(2) de la Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, conocida como la Ley Electoral de Puerto Rico (Ley Electoral), 16 L.P.R.A. see. 3272(2).

 El peticionario Jorge Suárez Cáceres (Suárez Cáceres) y el recurrido Ángel Rodríguez Otero (Rodríguez Otero) son los dos candidatos que se disputan el último escaño senatorial del Partido Popular Democrático (P.P.D.) añadido en virtud de la “Ley de Minorías”.

 Silva v. Hernández Agosto, 118 D.P.R. 45 (1986).

 La interpretación de esa disposición se dio a petición de la Oficina de Sistemas de Información y Procesamiento Electoral de la Comisión Estatal de Elecciones (C.E.E.). Para esa fecha, la C.E.E. estaba compuesta por Ramón E. Gómez Colón (Presidente) y los comisionados electorales Gerardo A. Cruz Maldonado, por el P.P.D.; Ramón Bauzá Escóbales, por el Partido Nuevo Progresista (P.N.P.); Juan Dalmau Ramírez, por el Partido Independentista Puertorriqueño (P.I.P.), y Nelson Rosario Rodríguez, por el partido Puertorriqueños por Puerto Rico (P.P.R.).

 Una papeleta en blanco es “aquella que habiendo sido depositada en la urna por el elector no tenga marca alguna de votación”. Art. 1.003(30) de la Ley Electoral, 16 L.P.R.A. sec. 3003(30).

 La Ley Electoral define papeleta protestada como “aquella en que aparezca arrancada la insignia de algún partido; escrito un nombre, salvo que sea en la columna de candidatos no encasillados; o tachado el nombre de un candidato, o que contenga iniciales, palabras, marcas o figuras de cualquier clase que no fueren de las permitidas para consignar el voto”. Art. 1.003(36) de la Ley Electoral, 16 L.P.R.A. see. 3003(36).

 La papeleta nula es “aquella votada por un elector que posteriormente a una elección la Comisión Estatal de Elecciones determine que no debe contarse o consignarse a los efectos del resultado de dicha elección”. Art. 1.003(35) de la Ley Electoral, 16 L.P.R.A. sec. 3003(35).

 Apéndice del Escrito de certiorari, págs. 1-2.

 16 L.P.R.A. sec. 3268.

 Según la C.E.E., el escrutinio general para el distrito senatorial de Humacao arrojó los siguientes resultados en cuanto a los votos obtenidos por los distintos candidatos:
Ramón Díaz (P.N.P.) 117,408
Mariíta Santiago (P.N.P.) 117,341
José Luis Dalmau Santiago (P.P.D.) 115,612
Jorge Suárez (P.P.D) 110,777
Sylvia Roldán Cruz (P.P.R.) 7,227
ángel Nieves Rivera (P.P.R.) 6,740
Felicita (Felá) Cotto Ortiz (P.I.P) 4,865
Juan (Cholo) Lebrón López (P.I.P.) 4,678
Otros 2,828
Total 487,476

 Posteriormente, el Ledo. Cruz Maldonado fue sustituido por el Ledo. Nicolás Gautier Vega (Ledo. Gautier Vega) como Comisionado Electoral del P.P.D.

 Había consenso en cuanto a que no existía la diferencia de votos requerida por el Art. 6.011 de la Ley Electoral, 16 L.P.R.A. see. 3271, para efectuar un recuento. Esto es, que no había una diferencia, entre dos candidatos a un mismo puesto, de cien votos o menos, o de la mitad del uno por ciento de los votos totales depositados para esa posición.

 La sentencia del Tribunal de Apelaciones fue archivada en autos y notificada el 29 de diciembre de 2008.

 Véase Apéndice del Escrito de certiorari, págs. 20-21.

 ei y¡ de diciembre de 2008, las partes ofrecieron traer ante el foro de instancia a los siguientes peritos en el caso KPE2008-4333: Ledo. José Valentín, director de Planificación de la C.E.E. (perito del P.P.D.); Benicio Carmona Márquez, director de Escrutinio de la C.E.E. (perito de la C.E.E.); Walter Vélez, secretario de la C.E.E., y Edwin Mundo Ríos, Comisionado Electoral del P.N.P., los últimos dos como peritos del P.N.P. Sin embargo, las partes renunciaron posteriormente a la presentación de tales peritos y el caso quedó sometido sólo con el testimonio del perito de la C.E.E.

 El Tribunal de Primera Instancia (T.P.I.) expresó que el recuento sería sobre “todos los votos emitidos en las líneas dos (2) y tres (3) de la papeleta para los cargos de Senadores del Distrito de Humacao y para todos los partidos políticos que participaron en esa contienda electoral”. Apéndice del Escrito de certiorari, pág. 34. Los candidatos por el mencionado distrito eran: José L. Dalmau Santiago y Jorge Suárez por el P.P.D., Ramón Díaz y Mariíta Santiago por el P.N.P., Felicita (Felá) Cotto Ortiz y Juan (Cholo) Lebrón López por el P.I.P., y Angel Nieves Rivera y Sylvia Roldán Cruz por el P.P.R.

 Aunque en la Resolución CEE-RS-08-125 se incluye la frase “nominación directa de personas naturales”, entendemos que debió leer “nominación directa de personajes ficticios”. Véase Apéndice del Escrito de certiorari, pág. 129.

 El archivo en autos de copia de la resolución también fue el 30 de diciembre de 2008. Véase Apéndice del Escrito de certiorari, págs. 37-38.

 Los dos comisionados electorales que votaron afirmativamente fueron: Edwin Mundo Ríos (por el P.N.R) y el Ledo. Gautier Vega (por el P.P.D).

 Los siguientes candidatos fueron electos para ocupar escaños como senadores por acumulación por el P.P.D.: Alejandro García Padilla, Antonio J. (Tony) Fas Alzamora, Eduardo Bhatia, Cirilo Tirado y Sila Mari González. Mientras, Juan Eugenio Hernández Mayoral, José L. Dalmau Santiago y Eder Ortiz Ortiz obtuvieron escaños en el Senado de Puerto Rico en virtud de la “Ley de Minorías”.

 La Resolución CEE-RS-09-01 fue archivada en autos y notificada el 8 de enero de 2009. Véase Apéndice del Escrito de certiorari, págs. 57-59.

 Véase Apéndice del Alegato de la parte recurrida, pág. 64.

 íd., págs. 73-75.

 En referencia al Art. Ill, Sec. 7 de la Constitución de Puerto Rico, supra, el Comisionado Electoral del P.P.D. indicó que “no se desprende de ninguna parte en dicha disposición constitucional facultad alguna para que la Asamblea Legislativa apruebe o delegue a esta Comisión leyes, normas o reglas que atenten contra el propósito de determinar los miembros adicionales de un Partido de Minoría por un método entendible, confiable y fácil de aplicar como lo es el de proporción matemática de resultados, que nunca falla. Precisamente, criterio que se ha estudiado y resuelto desde hace más de 62 años por virtud de las Opiniones del Secretario de Justicia Núms. 81, 82 y 86 que expresamente prohíben el crear “empates artificiales” para sortear escaños en contravención a la voluntad sagrada del pueblo a través del voto depositado a candidatos”. (Enfasis en el original.) Véase Apéndice del Alegato de la parte recurrida, pág. 87.

 Vease Art. 1.016 de la Ley Electoral, 16 L.P.R.A. sec. 3016a.

 En la certificación oficial aparecen las fechas 9 de enero de 2008 y 7 de enero de 2008, respectivamente. Sin embargo, entendemos que esas menciones al año 2008 constituyen errores tipográficos y que el año correcto es 2009.

 Debemos mencionar que en esa vista, el Comisionado Electoral del P.P.D., Ledo. Gautier Vega, solicitó ser relevado de continuar en el pleito para que entonces ambos candidatos se disputaran entre ellos el último escaño vacante de senador por adición del P.P.D., ya que ese partido acataría la determinación de los tribunales respecto al caso.

 Entre sus determinaciones de hechos, el tribunal de instancia expresó que el Secretario de la C.E.E. había notificado a Suárez Cáceres y a Rodríguez Otero por considerarlos partes interesadas, ello conforme a las instrucciones del Presidente de la C.E.E. El foro primario también determinó que no había duda de que ambos candidatos eran partes interesadas en el caso. Véase Apéndice del Escrito de certiorari, pág. 162.

 En esa ocasión, Rodríguez Otero señaló que el tribunal de instancia cometió los siguientes seis (6) errores:
1. Determinar que el escrito de revisión presentado por Suárez Cáceres cumplió con el Art. 1.016 de la Ley Electoral, supra, que dispone el término mandatorio de diez días siguientes a la notificación de la resolución para recurrir en revisión judicial.
2. Determinar que Suárez Cáceres tenía standing para solicitar la revisión de la Resolución CEE-RS-08-125, aun cuando el estado de derecho vigente es que a éste no le asiste el derecho a solicitar recuento, y la resolución aludida trata sobre la forma y manera de efectuar un recuento.
3. No determinar que la controversia planteada ante el tribunal de instancia en el escrito de revisión resultó académica.
4. Interpretar que la frase “votos totales depositados para esa posición” no incluía las papeletas en blanco, las nulas y las de nominación directa de personajes ficticios, según expuestas en el Art. 6.011 de la Ley Electoral, supra, aun cuando el estado de derecho vigente en Puerto Rico es que se respete la voluntad del elector según el voto depositado en las urnas.
5. Sustituir el criterio de la C.E.E. expuesto en la Resolución CEE-RS-08-125 de dejar sin efecto la Resolución CEE-RS-08-04, que adolece de serios defectos de inconstitucionalidad.
6. Dejar vigente, para adjudicar la presente controversia entre Rodríguez Otero y Suárez Cáceres, la Resolución CEE-RS-08-04 de 23 de enero de 2008, la cual dis-pone que no se considerarán “votos depositados para esa posición” las papeletas en blanco, las protestadas, las nulas o las de nominación directa de personajes ficticios, aun cuando no se aplicó para ningún candidato electo en las elecciones del 2008, lo que resultaría en una violación a la disposición constitucional sobre la igual protección de las leyes.

 Además, el foro apelativo intermedio dispuso que la C.E.E. debía certificar: (1) quiénes eran las “partes interesadas” que fueron notificadas de la resolución CEE-RS-08-125 emitida el 30 de diciembre de 2008 y de la resolución CEE-RS-08-04 de 23 de enero de 2008, esta última con la información sobre la fecha del archivo en autos y la fecha o las fechas de notificación de la resolución, y (2) quiénes fueron notificados de la Resolución CEE-RS-08-125 en una fecha posterior al 30 de diciembre de 2008, las fechas de esas notificaciones posteriores y las razones para tales notificaciones en una fecha posterior. Véase Apéndice del Escrito de certiorari, págs. 169-174.

 La C.E.E. señaló que, conforme a un estudio comparativo que realizó, bajo un esquema ambos candidatos tienen un 22.7% en la proporción de los votos y bajo otro esquema tienen un 22.8%; en ambos esquemas se descartaron las fracciones menores de la mitad de uno.
En particular, la C.E.E. informó que, bajo un esquema, la diferencia entre un 22.7336% de Rodríguez Otero y un 22.7246% de Suárez Cáceres es de 0.009. Mientras que bajo el otro esquema, la diferencia entre un 22.8525% de Suárez Cáceres y un 22.8481% de Rodríguez Otero es de 0.0045. Según la C.E.E., ninguna de las diferencias (0.009 y 0.0045) supera la mitad de uno. La agencia informó que el mencionado estudio comparativo fue marcado en evidencia en los procedimientos ante el tribunal de instancia. Véase Apéndice del Escrito de certiorari, págs. 175-177.

 En su sentencia, el Tribunal de Apelaciones resolvió que el término de diez días para presentar el recurso de revisión judicial sobre la determinación de la C.E.E. (la Resolución CEE-RS-08-125) comenzó a transcurrir el 31 de diciembre de 2008 y vencía el 9 de enero de 2009; Suárez Cáceres presentó su recurso el 20 de enero de 2009.

 Como mencionamos, el Secretario de la C.E.E. notificó a Suárez Cáceres el 7 de enero de 2009 y a Rodríguez Otero el 9 de enero de 2009.

 A petición del tribunal apelativo intermedio, el Secretario de la C.E.E. ex-pidió una certificación el 20 de febrero de 2009, en la cual expuso que la Resolución CEE-RS-08-04 fue notificada a las partes interesadas el 31 de enero de 2008 y el 4 de febrero de 2008.

 Apéndice del Escrito de certiorari, pág. 233.

 íd., pág. 254.

 Rodríguez Otero indicó que en Sánchez y Colón v. E.L.A. I, 134 D.P.R. 445 (1993), “se garantizó el derecho del elector de depositar en las urnas su papeleta en *58 blanco como parte de expresar su inconformidad tanto a las propuestas presentadas en la papeleta en un procedimiento plebiscitario, así como también le es de aplicación la norma de cuando se trata de papeletas de elecciones generales donde el elector no favorece ninguno de los candidatos presentados en dicha papeleta. Es decir, parte del sagrado derecho del elector a expresar su voluntad a través del voto depositado en blanco, nulas o de nominación directa”. Memorando en oposición a que se expida el auto de certiorari, pág. 8.

 En esa resolución, el Juez Presidente Señor Hernández Denton emitió un voto disidente, al cual se unieron la Jueza Asociada Señora Fiol Matta y la Juez Asociada Señora Rodríguez Rodríguez.

 4 L.P.R.A. Ap. XXI-A.

 Véase Alegato de la parte recurrida, pág. 2.

 Véase Alegato de la parte recurrida, pág. 14.

 íd., pág. 16.

 Const. EE.UU., L.P.R.A., Tomo 1.

 Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 720 (1980).

 Noriega v. Hernández Colón, 135 D.P.R. 406, 421 (1994); E.L.A. v. Aguayo, 80 D.P.R. 552, 584 (1958).

 Com. de la Mujer v. Srio. de Justicia, supra, págs. 720-721.

 Noriega v. Hernández Colón, supra, págs. 421-422.

 Véase Apéndice del Escrito de certiorari, pág. 175.

 Véase Apéndice del Alegato de la parte recurrida, pág. 66.

 Alegato de la parte recurrida, págs. 14-15.

 Frente Unido Independentista v. C.E.E., 126 D.P.R. 309, 319 (1990).

 López v. C.E.E., 161 D.P.R. 527, 541 (2004); Miranda v. C.E.E., 141 D.P.R. 775, 784 (1996), citando a P.N.P. v. Rodríguez Estrada, Pres. C.E.E., 123 D.P.R. 1, 30-31 (1988). Véase, además, D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Colombia, Ed. Forum, 2001, pág. 582.

 Miranda v. C.E.E., supra; Granados v. Rodríguez Estrada I, 124 D.P.R. 1 (1989).

 Meléndez v. Asoc. Hosp. del Maestro, 156 D.P.R. 828, 863 (2002); Colón y otros v. K-Mart y otros, 154 D.P.R. 510, 520 (2001); Trinidad v. Chade, 153 D.P.R. 280, 291 (2001); Mun. de Ponce v. A.C. et al., 153 D.P.R. 1, 27 (2000); Monllor v. Soc. de Gananciales, 138 D.P.R. 600, 610 (1995).

 32 L.P.R.A. Ap. III.

 Meléndez v. Caribbean Int’l News, 151 D.P.R. 649, 664 (2000); Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 152 (1996).

 Quiles Pérez v. Cardona Rosa, 171 D.P.R. 443 (2007); Argüello v. Argüello, 155 D.P.R. 62, 79 (2001).

 Véase Apéndice del Escrito de certiorari, pág. 163.

 íd., pág. 164.

 Ni en la sentencia objeto de revisión en este recurso ni en la resolución para considerar una moción de reconsideración (presentada por Suárez Cáceres), el Tribunal de Apelaciones imputa al Presidente de la C.E.E. haber actuado ultra vires al ordenar al Secretario de la C.E.E. notificar a Suárez Cáceres como parte interesada. De hecho, el Tribunal de Apelaciones reconoce que, en ausencia de unanimidad de criterios entre los comisionados electorales (como en el caso de autos), “por inequívoco mandato de ley la CEE se expresa mediante el dictamen de su Presidente”. Apéndice del Escrito de certiorari, pág. 254.

 Regla 43.2 de Procedimiento Civil, supra.

 Alegato de la parte recurrida, pág. 11.

 Argüello v. Argüello, supra, pág. 79; Pueblo v. Bonilla Romero, 120 D.P.R. 92, 111 (1987).

 Argüello v. Argüello, supra, pág. 78.

 Miranda Soto v. Mena Eró, 109 D.P.R. 473, 482 (1980).

 Pueblo v. Valentín, 135 D.P.R. 245, 251 (1994).

 IM Winner, Inc. v. Mun. de Guayanilla, 151 D.P.R. 30, 35 (2000).

 Falcón Padilla v. Maldonado Quirós, 138 D.P.R. 983, 990 (1995).

 Colón Torres v. A.A.A., 143 D.P.R. 119, 124 (1997); García v. Adm. del Derecho al Trabajo, 108 D.P.R. 53 (1978).

 P.I.P. v. C.E.E., 120 D.P.R. 580 (1988); Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84 (1980).

 Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979); Reynolds v. Sims, 377 U.S. 533 (1964).

 Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 278.

 Ramírez de Ferrer v. Mari Brás, 144 D.P.R. 141, 223 (1997), opinión concurrente del Juez Asociado Señor Negrón García.

 Sánchez y Colón v. E.L.A. I, supra.

 íd., pág. 449.

 Id., pág. 483, opinión disidente del Juez Asociado Señor Rebollo López.

 Véase Burdick v. Takushi, 504 U.S. 428, 441 (1992).

 íd., pág. 441.

 Art. 5.005 de la Ley Electoral, 16 L.RR.A. see. 3205.

 máxime cuando, como en este caso, no sabemos siquiera con qué facción partidista, si alguna, simpatiza ese elector, a quien tendríamos decidiendo por senadores del P.P.D. El Estado tiene un interés legítimo en evitar que los votantes de un partido elijan los candidatos de otro partido. Esto es lo que en inglés se conoce como “party raiding”. Burdick v. Takushi, supra, pág. 435. Véase, además, Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 219 (1986).

 Suárez v. C.E.E. I, supra, pág. 356. Véase, además, P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400, 460 (1980).

 P.P.D. v. Barreto Pérez, 110 D.P.R. 376, 380 (1980).

 Véase Apéndice del Escrito de certiorari, págs. 38 y 176.

 Art. Ill, Sec. 7, Const. E.L.A., supra.

 O.E. Resumil de Sanfilippo y R. Faria González, La garantía constitucional ala representación de las minorías en la Asamblea Legislativa: naturaleza, alcance y extensión, 65 (Núm. 2) Rev. Jur. U.RR. 329, 343-344 (1996).

 4 Diario de Sesiones de la Convención Constituyente 2595-2596 (1951).

 P.P.D. v. Peña Clos I, supra, pág. 794, opinión concurrente de la Juez Asociada Señora Naveira de Rodón.

 Const. E.L.A., supra, pág. 385.

 Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14. Véase Silva v. Adm. Sistema de Retiro, 128 D.P.R. 256, 269 (1991).

 Rosario v. Dist. Kikuet, Inc., 151 D.P.R. 634, 643 (2000).

 Martínez v. Rosado, 165 D.P.R. 582, 589 (2005); Procuradora Paciente v. MCS, 163 D.P.R. 21, 43 (2004); Pacheco v. Estancias, 160 D.P.R. 409, 432-433 (2003); Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 75 (2000).

 P.R.T.C. v. J. Reg. Tel. P.R., 151 D.P.R. 269, 283 (2000).

 Costa, Piovanetti v. Caguas Expressway, 149 D.P.R. 881, 889 (1999).

 Mun. de San Juan v. J.C.A., 149 D.P.R. 263, 280 (1999); Costa, Piovanetti v. Caguas Expressway, supra.

 Esto con sujeción al número total de legisladores adicionales previamente determinado y que correspondan a uno o cada uno de los partidos de minoría.

 Véase Alegato de la parte recurrida, pág. 14.

 Las dos consultas fueron referidas el 11 de diciembre de 1956 (Opinión Núm. 1956-81 y Opinión Núm. 1956-82) y fueron contestadas el 17 de diciembre de 1956. Ambas opiniones fueron suscritas por el Ledo. J.B. Fernández Badillo, secretario de justicia interino.

 La Ley Electoral de 1919, Ley Núm. 79 de 25 de junio de 1919, fue enmendada por la Ley Núm. 18 de 22 de agosto de 1952 para incluir el Art. 89(a).

 2¡¡i text0 ie£a de la manera siguiente:
“Al aplicar el párrafo antepenúltimo de la see. 7 del Art. Ill de la Constitución del Estado Libre Asociado de Puerto Rico se descartará y no se considerará fracción alguna que sea menos de la mitad de uno, y, en el caso de que resulten dos fracciones iguales la Junta Insular de Elecciones procederá a hacer la determinación en cuanto al candidato que debe certificarse al Gobernador mediante un sorteo en la misma *81 forma que en el caso de un empate entre dos candidatos resultante del escrutinio general.” 16 L.P.R.A. see. 276 (ed. 1955).

 Op. Sec. Just. Núm. 1956-81, pág. 301.

 págs. 301-302.

 Op. Sec. Just. Núm. 1956-82, pág. 304.

 íd.

 Nuevamente, el texto interpretado por este segundo Secretario de Justicia era similar al texto vigente en el 1956 y al que nos ocupa.

 La opinión fue suscrita el 27 de diciembre de 1960 por el Ledo. Francisco Espinosa, Jr., secretario de justicia interino. Op. Sec. Just. Núm. 1960-82.

 Op. Sec. Just. Núm. 1960-82, pág. 402. En este párrafo se hace referencia al Art. 89(a) de la Ley Electoral vigente en 1960, disposición que tiene la misma expresión del Art. 6.012 de la actual Ley Electoral, supra.

 San Gerónimo Caribe Project v. A.R.Pe., 174 D.P.R. 640 (2008).

 véase C. Gorrín Peralta, Fuentes y proceso de investigación jurídica, Or-ford, Ed. Equity Publishing Company, 1991, pág. 259; E. Vázquez Bote, Derecho Civil de Puerto Rico, San Juan, Eds. Jurídicas, Í972, T. I, Vol. 1, pág. 263.

 Vázquez Vélez v. Caro Moreno, 175 D.P.R. 986 (2009), voto particular disidente de la Juez Asociada Señora Rodríguez Rodríguez, al cual se unió el Juez Presidente SeñorHernández Denton.